UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

WOODS HOLE OCEANOGRAPHIC )
INSTITUTION, )
   **Plaintiff,** )
          )    **CIVIL ACTION NO.:**
**v.** )    **1:17-cv-12301-NMG**
          )
**ATS SPECIALIZED, INC., RIDGEWAY** )
**INTERNATIONAL USA, INC., GUY** )
**TOMBS LIMITED, AUSTRALIAN** )
**NATIONAL MARITIME MUSEUM,** )
**SAM BROUGHTON WRIGHT, JR.,** )
**SERVICE TIRE TRUCK CENTER, INC.,** )
**AND TRAVELCENTERS OF AMERICA** )
     **Defendants.** )
_____)

**PLAINTIFF WOODS HOLE OCEANOGRAPHIC INSTITUTION'S
OPPOSITION TO AUSTRALIAN NATIONAL MARITIME MUSEUM'S
MOTION TO DISMISS FOR LACK OF SUBJECT MATTER AND
PERSONAL JURISDICTION AT DOCKET NO. 50**

   NOW COMES the Plaintiff, Woods Hole Oceanographic Institution (hereinafter "WHOI"), in the

above entitled Action, by and through its undersigned attorney, Holbrook & Murphy, and files its

Opposition to Australian National Maritime Museum's ("ANMM") Motion to Dismiss for lack of subject

matter jurisdiction and lack of personal jurisdiction at Docket No. 50.

**SUMMARY OF THE FACTS**

   WHOI is a nonprofit corporation organized and existing under the laws of the

Commonwealth of Massachusetts, with a principal place of business on Cape Cod at 98 Water Street,

Woods Hole, Massachusetts 02543.  *Declaration of Christopher Land, Esq.*, dated September 11, 2018

("*Land Dec.*") at ¶3; *Declaration of Robert S.C. Munier*, dated September 11, 2018 ("*Munier Dec.*") at

¶2; *Declaration of Anthony Tarantino*, dated September 11, 2018 ("*Tarantino Dec.*") at ¶2.

   Since WHOI's formation, it has been dedicated to research and education to advance

understanding of the ocean and its interaction with the earth system, and to communicate this

understanding for the benefit of society. *Land Dec.* at ¶5; *Munier Dec.* at ¶4; *Tarantino Dec.* at ¶4.

WHOI is the owner of the human occupied vehicle (HOV) *DEEP SEA CHALLENGER*, a custom-designed and built submersible capable of reaching full-ocean depth (hereinafter "the Submersible"). *Land Dec.* at ¶6; *Munier Dec.* at ¶5; *Tarantino Dec.* at ¶5. WHOI has owned the Submersible since March 26, 2013, at which time the Submersible was in good working condition with an appraised fair market value of $32,593,000. *Land Dec.* at ¶7; *Munier Dec.* at ¶6; *Tarantino Dec.* at ¶6. WHOI has consistently kept and maintained the Submersible in substantially similar condition at its facilities in Woods Hole, Massachusetts. *Id.*

ANMM is a maritime museum located in Australia. *Declaration of Samuel P. Blatchley,* dated September 11, 2018 ("*Blatchley Dec.*") at ¶15. ANMM is supported and funded, at least in part, through general, public donations. *Id.* According to its web page, it has a membership base of over 5,500 memberships, covering more than 15,000 people. *Id.* According to its web site, ANMM holds over 200 commercial events annually. *Id.* ANMM had an annual budget of approximately $20 million to $25 million, with approximately $800,000 annually to spend on exhibits. *Land Dec.* at ¶22; *Munier Dec.* at ¶22; *Tarantino Dec.* at ¶21.

ANMM purposefully and intentionally reached into Massachusetts for the commercial purpose of leasing the Submersible. *See generally Land Dec.*; *Munier Dec.*; *Tarantino Dec.*

Beginning in September 2013, ANMM contacted WHOI with a request to borrow the Submersible. *Land Dec.* at ¶8; *Munier Dec.* at ¶7; *Tarantino Dec.* at ¶7. Over two years of extremely detailed negotiations between ANMM and WHOI followed, wherein the parties negotiated the loan's terms and conditions, including but not limited to price, insurance, indemnity, choice of law, shipping terms and instructions, controls, required reports, communications, and care for the Submersible while in ANMM's care, custody and control. *Id.*

These negotiations between ANMM and WHOI included: multiple meetings in Woods Hole, Massachusetts between ANMM and WHOI personnel to discuss the terms and conditions of the loan; ANMM personnel inspecting the Submersible in Woods Hole, Massachusetts; extensive emails between

ANMM and WHOI; and, numerous lengthy and detailed telephone conferences and conference calls between ANMM and WHOI personnel. *Land Dec.* at ¶9; *Munier Dec.* at ¶8; *Tarantino Dec.* at ¶8.

Upon conclusion of these lengthy negotiations, on June 24, 2015, ANMM's Chief Executive Officer, Kevin Sumption signed the thirty-six (36) page Loan Agreement for the Submersible, and mailed to WHOI in Massachusetts. *Land Dec.* at ¶10; *Munier Dec.* at ¶9; *Tarantino Dec.* at ¶9. Upon receipt of the executed Loan Agreement, WHOI also executed the Loan Agreement. *Land Dec.* at ¶46; *Munier Dec.* at ¶46; *Tarantino Dec.* at ¶45.

Under the Loan Agreement, ANMM agreed to pay WHOI a fee of $USD 30,000 for the loan of the Submersible. *Land Dec.* at ¶24; *Munier Dec.* at ¶24; *Tarantino Dec.* at ¶23.

Further, pursuant to the Loan Agreement ANMM agreed to pay WHOI, on a time and materials basis, certain costs incident to WHOI's work and support in effecting the loan. ANMM made (some but not all) of these payments by way of wire transfer to WHOI's bank, located in Massachusetts. *Land Dec.* at ¶12; *Munier Dec.* at ¶11; *Tarantino Dec.* at ¶11.

Additionally, under the Loan Agreement, ANMM was responsible for collecting the Submersible at Woods Hole Oceanographic Institution, in Woods Hole, Massachusetts at the loan period's inception, and for returning it to Woods Hole, Massachusetts in undamaged condition upon the loan period's termination. *Land Dec.* at ¶13; *Munier Dec.* at ¶12; *Tarantino Dec.* at ¶12.

On July 22, 2015, ANMM took care, custody, and control of the Submersible in Woods Hole, Massachusetts. *Land Dec.* at ¶14; *Munier Dec.* at ¶13; *Tarantino Dec.* at ¶13. On July 23, 2015, while in ANMM's care, custody, and control, the Submersible was damaged by fire. *Id.*

ANMM engaged in commercial activity in Massachusetts and the United States. The specific negotiations, communications, and contacts are set forth exhaustively in the Declarations of Christopher Land, Anthony Tarantino, Robert Munier, and Samuel P. Blatchley which are attached hereto and incorporated by reference herein. *See generally Land Dec.*; *Munier Dec.*; *Tarantino Dec*; *Blatchley Dec.*

In its Complaint WHOI alleges, *inter alia*, that ANMM breached its contractual obligations. Docket No. 1. ANMM argues that the doctrine of sovereign immunity immunizes it from the

consequences of such breaches, and that this Honorable Court lacks personal jurisdiction over ANMM for its purposeful and intentional acts occurring in Massachusetts. Docket No. 51.

ANMM's activities in Massachusetts, which form the basis of WHOI's suit, were not acts "peculiar to sovereigns," but acts that could be and are performed daily by private parties.  Accordingly, ANMM acted "in the manner of a private player within [the market]" such that "[ANMM's] actions are 'commercial' within the meaning of the [Foreign Sovereign Immunity Act]," excepting it from sovereign immunity. *Republic of Argentina v. Weltover Inc.,* 504 U.S. 607, 614 (1992).

Therefore, this Court has jurisdiction to adjudicate the disputes arising out of ANMM's lease of the Submersible.

### STANDARD OF REVIEW FOR MOTION TO DISMISS REGARDING SUBJECT MATTER JURISDICTION

ANMM moves to dismiss the Plaintiff's Complaint pursuant to, *inter alia*, Fed. R. Civ. P. 12(b)(1) as it claims that it is immune from jurisdiction under the Foreign Sovereign Immunity Act (the "FSIA").

The FSIA establishes the frame work to determine if a United States Court, state or federal, has jurisdiction over a foreign state. *Republic of Argentina v. Weltover Inc.,* 504 U.S. 607, 611 (1992). Under the FSIA, "a foreign state shall be immune from the jurisdiction of the courts of the United States," unless a statutorily enumerated exception applies. 28 U.S.C. § 1604. The FSIA "provides the sole basis for obtaining jurisdiction over a foreign sovereign in the United States." *Republic of Argentina v. Weltover, Inc., 504 U.S. 607* (1992) (quotation marks and citations omitted).

Once a defendant establishes that it is indeed a "foreign state," a plaintiff must "establish by a preponderance of the evidence that an exception under the FSIA permits jurisdiction over [the defendant]." *MMA Consultants 1, Inc. Republic of Peru*, 719 Fed.Appx. 47, 51 (2d Cir. 2017). If the plaintiff demonstrates by a preponderance of the evidence that a FSIA exception applies, the defendant "then bears the ultimate burden of persuasion that the FSIA exception does not apply." *Id; See also*

*Anglo-Iberia Underwriting Mgmt. v. P.T. Jamsostek*, 600 F.3d 171, 175 (2d Cir. 2010) ("The ultimate burden of persuasion remains with the party seeking sovereign immunity").

**I.      The FSIA commercial activity exception provides that ANMM is not immune from jurisdiction in this matter**

The commercial activity exception in the FSIA withdraws sovereign immunity from a foreign state if:

1) The foreign state engaged in commercial activity;

2) The Plaintiff's lawsuit is based upon the foreign state's commercial activity (or an act in connection with the foreign state's commercial activity); and,

3) The foreign state's act or activity has some form of nexus to the United States.

28 U.S.C. § 1605(a)(2).

**A.      ANMM engaged in "commercial activity" under the FSIA**

By entering into the Loan Agreement, arranging for, *inter alia*, the transportation and insurance of the Submersible, and breaching the Loan Agreement, ANMM engaged in "commercial activity" as contemplated under the FSIA.

The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). Further, "when a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." *Weltover*, 504 U.S. at 614. The relevant inquiry for the Court is to determine whether the particular activity qualifies as commercial based on the *nature* of the activity rather than its *purpose*. *See* 28 U.S.C. § 1603(d) ("The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose"); *Weltover*, 504 U.S. at 614. A "commercial activity" under the FSIA is present when the *nature* of the conduct at issue, regardless of a foreign state's *purpose* for the

conduct, is the type of conduct that private parties engage in "for trade and traffic or commerce." *See Weltover*, 504 U.S. at 614 (citation omitted).[1]

Here, ANMM contacted WHOI in Massachusetts in order to lease the Submersible. *Land Dec.* at ¶8; *Munier Dec.* at ¶7; *Tarantino Dec.* at ¶7. Over a period of years, ANMM and WHOI discussed and negotiated the loan of the Submersible and its transport from Massachusetts to Australia. *Id.* The negotiations between ANMM and WHOI were performed through numerous email correspondence, lengthy conference call discussions, and in person meetings and viewings of the Submersible, whereby ANMM representatives came to Massachusetts. *See generally Land Dec.*; *Munier Dec.*; *Tarantino Dec.* Eventually, ANMM and WHOI executed the Loan Agreement for the Submersible. *Land Dec.* at ¶¶44-46; *Munier Dec.* at ¶44-46; *Tarantino Dec.* at ¶43-45. The Loan Agreement, which the parties agreed was governed by Massachusetts law, required ANMM to arrange for the collection of the Submersible in Massachusetts. *Land Dec.* at ¶12 & 47; *Munier Dec.* at ¶13 & 47; *Tarantino Dec.* at ¶12 & 46. The Loan Agreement also required ANMM to insure against the Submersible's damage or loss after "collection" in Massachusetts and until "return" to Massachusetts. *Id.* ANMM hired a freight forwarder, Ridgeway International USA, Inc. ("Ridgeway"), to assist in transporting the Submersible from Massachusetts. *Land Dec.* at ¶55; *Munier Dec.* at ¶55; *Tarantino Dec.* at ¶54. Indeed, ANMM signed a power of attorney granting Ridgeway the power, as its agent, to enter into contracts on ANMM's behalf for the ground transportation of the Submersible in Massachusetts.[2] *Land Dec.* at ¶55; *Munier Dec.* at ¶57; *Tarantino Dec.* at ¶56. Ridgeway, acting as ANMM's agent, engaged ATS Specialized, Inc. ("ATS") to transport

---

[1] Conversely, if the conduct or transaction in question is "peculiar to sovereigns" and of a type in which private citizens cannot engage, the commercial activity exception does not apply. *See Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993) (*quoting Weltover*, 504 U.S. at 614).

[2] Specifically, in the power of attorney, ANMM authorized Ridgeway to "act for and on its behalf as a true and lawful agent and attorney of [ANMM] for and in the name, place, and stead of [ANMM] from this date [July 22, 2015] in the United States." *Land Dec.* at ¶55; *Munier Dec.* at ¶57; *Tarantino Dec.* at ¶56. The fact that ANMM performed certain acts through an agent is of no moment as "a foreign state can surrender its immunity by virtue of activities committed by its agent…" *BP Chems. Ltd. v. Jiangsu Sopo Corp.*, 285 F.3d 677, 687-88 (8th Cir. 2002); *Virtual Defense & Development Intern., Inc. v. Republic of Moldova*, 133 F. Supp. 2d 1, 5 (D.D.C. 1999) (holding that the "legislative history surrounding a foreign sovereign's representation in the United State by an agent suggests that 'a foreign state, in Congress's view, can surrender immunity by virtue of activities committed by an agent, and that, consequently, the 'carried on by' requirement can be interpreted in light of broad agency principles.'") (*citing Maritime International Nominees Establishment v. Republic of Guinea*, 693 F.2d 1094, 1004-05 (D.D.C. 1982)).

the Submersible from Woods Hole, Massachusetts to Baltimore, Maryland. *Land Dec.* at ¶60-61; *Munier Dec.* at ¶60-61; *Tarantino Dec.* at ¶59-60. ATS, on behalf of ANMM, collected the Submersible at WHOI's property and transported it out of Massachusetts. *Id.* The transport by ANMM's agent to Baltimore was cut short when the Submersible caught fire and burned aboard ATS's truck in Connecticut. *Land Dec.* at ¶66; *Munier Dec.* at ¶66; *Tarantino Dec.* at ¶65.

Pursuant to the Loan Agreement, ANMM was also obligated to procure insurance for the Submersible. *Land Dec.* at ¶47; *Munier Dec.* at ¶47; *Tarantino Dec.* at ¶46. Indeed, Ridgeway alleges that, on behalf of ANMM, it arranged for insurance to cover the Submersible's transportation from Massachusetts, and "then charged ANMM for the cost of the Cargo Policy." Docket No. 61-1.

The nature of ANMM's activities – negotiating and entering into a lease agreement, insuring the leased object, arranging for the transport of the leased object, and breach of the lease agreement – are "the type of actions by which a private party engages in trade and traffic or commerce," and are "not peculiar to sovereigns." *Weltover*, 504 U.S. at 614. [3]

Indeed, in analyzing a similar, but smaller, record before it in a related declaratory judgment action then pending in the United States District Court for the District of Connecticut, styled as *Anderson Trucking Svc Inc. v. Eagle Underwriting Group, Inc., et al.*, Civil Action No. 3:17-cv-00817-CSH (the "Connecticut Action"), the Connecticut Court held that ANMM's "actions [were] inherently commercial," as "[t]hey [were] acts that could be performed by private parties," and were indeed "performed by private parties on a daily basis." Docket No. 61-1, p. 10.[4] Additionally, other Courts have

---

[3] Like in the Connecticut Action, ANMM here similarly characterizes its activities in connection with this Action as a "not-for-profit exchange of a historical and cultural artifact" between "not-for-profit enterprises." Docket No. 51, p. 14. The Connecticut Court found "[ANMM's] argument [in this regard as] unpersuasive" because "[ANMM's] argument, in essence, is that the *purpose*, of the activities in which [ANMM] engaged was sovereign; however, the FSIA makes it clear that the relevant inquiry is the *nature* of the activities not their purpose. Further, it is well established that when a foreign sovereign engages in commercial activity, 'that activity retains its commercial nature, even though the foreign sovereign acts without a profit motive.'" Docket 61-1, p. 11 (citing, *Weltover*, 941 F. 2d, 150 (footnote omitted)).

[4] The Connecticut Court also found that "[c]ourts examining similar activities, [like those of ANMM], carried on by foreign sovereigns have determined that such activities are commercial in nature for the purposes of the FSIA." P. 10 (*citing In re Air Crash Near Nantucket Island, Massachusetts, on Oct. 31, 1999*, 392 F. Supp. 2d 461, 468–69 (E.D.N.Y. 2005) ("MISR's issuance of the Hull and Liability Policy was clearly a commercial activity[.]"), *aff'd in part, appeal dismissed in part sub nom., The Boeing Co. v. Egyptair*, No. 05-5986-CV, 2007 WL 1315716 (2d Cir.

found that the lease or charter of a vehicle, like ANMM did here, constitutes a "commercial activity" which exempts a foreign sovereign from immunity under the FSIA. *See, e.g., Ford Motor Co. v. Russian Federation*, 09 CIV. 1646 (JGK), 2010 WL 2010867, at *3 (S.D.N.Y. May 18, 2010) (holding that "leasing a motor vehicle is by nature a commercial activity that a private party can engage in. The legislative history of the FSIA indicates that 'leasing of property' is considered a commercial activity"); *Sealift Bulkers, Inc. v. Republic of Armenia*, 965 F. Supp. 81 (D.D.C. 1997) (holding that the charter of the vessel by the Republic of Armenia to transport wheat donated by the United States as foreign aid fell within the "commercial activity" exception to foreign sovereign immunity under the FSIA).

Accordingly, ANMM engaged in "commercial activity" as contemplated by the FSIA.

**B.  WHOI'S claim is "based upon" ANMM'S "commercial activity" as required under the FSIA**

The commercial activity exception requires that the plaintiff's lawsuit must be "based upon" the foreign state's "commercial activity" or an act in connection with the foreign state's commercial activity. 28 U.S.C. § 1605(a)(2). The "based upon" requirement is satisfied when the foreign state's alleged commercial activity or act, if proved, entitles the plaintiff to relief under its theory of the case. *See Nelson*, 507 U.S. at 357. In other words, the foreign state's commercial activity or act in connection with a commercial activity must give rise to the plaintiff's claim.

An "action is based upon the particular conduct that constitutes the gravamen of the suit." *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 396 (2015) (quotation marks and citation omitted)). Courts must look to or "zero[] in on the core" of the plaintiff's suit to determine whether the "based upon" requirement is satisfied, instead of individually analyzing each claim. *Id.* at 396. In doing so, a Court must

---

May 7, 2007); *Malewicz v. City of Amsterdam*, 362 F. Supp. 2d 298, 314 (D.D.C. 2005) ("[I]t is clear that the City of Amsterdam engaged in 'commercial activities' when it loaned the 14 Malewicz works to museums in the United States. There is nothing 'sovereign' about the act of lending art pieces, even though the pieces themselves might belong to a sovereign. Loans between and among museums (both public and private) occur around the world regularly"); *Universal Trading & Inv. Co. v. Bureau for Representing Ukrainian Interests in Int'l & Foreign Courts*, 898 F. Supp. 2d 301, 313–14 (D. Mass. 2012) (finding that a "series of agreements and powers of attorney" executed by the foreign sovereign, "as well as the work conducted" in service of those agreements by [plaintiff] and the attorneys that it hired, constitute commercial activity on which the instant litigation is based"), *aff'd*, 727 F.3d 10 (1st Cir. 2013)).

first identify the particular act or activity that forms the basis for the plaintiff's claims against the foreign state. *See Globe Nuclear Servs. and Supply (GNSS), Ltd. v. AO Techsnabexport*, 376 F.3d 282, 285-88 (4th Cir. 2004) (holding that in a breach of contract action the suit was based on the entrance into a contract and subsequent repudiation).

The Loan Agreement between WHOI and ANMM, governed by Massachusetts law, required ANMM to arrange for the collection of the Submersible in Massachusetts. *Land Dec.* at ¶12 & 47; *Munier Dec.* at ¶13 & 47; *Tarantino Dec.* at ¶12 & 46. The Loan Agreement also required ANMM to insure against the Submersible's damage or loss after "collection" in Massachusetts and until "return" to Massachusetts. *Id.* ANMM, through its freight forwarder and agent, hired ATS to transport the Submersible from Woods Hole, Massachusetts to Baltimore, Maryland. *Land Dec.* at ¶60-61; *Munier Dec.* at ¶60-61; *Tarantino Dec.* at ¶59-60. ATS, acting as ANMM's agent, collected the Submersible at WHOI's property and transported it through Massachusetts en route to Baltimore, Maryland. *Id.* Unfortunately, on or about July 23, 2015, while in Connecticut, the ATS truck transporting the Submersible caught fire, burning the Submersible, and causing massive damage to the Submersible. *Land Dec.* at ¶66; *Munier Dec.* at ¶66; *Tarantino Dec.* at ¶65. The Submersible was damaged while it was in ANMM's possession and control. *Land Dec.* at ¶62; *Munier Dec.* at ¶62; *Tarantino Dec.* at ¶61. At the moment the Submersible was damaged in the United States and in ANMM's possession and control, ANMM breached the Loan Agreement and its concomitant duties to, *inter alia*, ensure that the Submersible was properly safeguarded, kept free from damage after it left WHOI's property, and returned in the same good order and condition as when it was received. These acts form the "core" of WHOI's claims against ANMM. As such, WHOI's action is "based upon" ANMM's negotiation and entrance into the Loan Agreement and its subsequent breach. *Globe Nuclear Servs. and Supply (GNSS), Ltd.,* 376 F.3d at 288.

### C.  ANMM'S "acts" and "commercial activity" has a nexus with the United States

"For a court to exercise jurisdiction over a foreign sovereign under the commercial activity exception, the FSIA requires that some form of nexus be established between the sovereign's activity and

the United States." *Universal Trading & Inv. Co., Inc. v. Bureau for Representing Ukrainian Interests in Intern. and For. Courts*, 727 F.3d 10, 25 (1st Cir. 2013)

The requisite "nexus between a defendant's commercial activity and the United States may be shown under one of three circumstances" under the FSIA:

"(1) the activity was 'carried on in the United States';

(2) the activity performed in the United States is 'in connection with a commercial activity of the foreign state elsewhere'; or

(3) the activity occurred 'outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.'"

*Id.*

ANMM's negotiation and entrance into the Loan Agreement and its subsequent breach more than demonstrate "some form of nexus…between [ANMM's] activity and the United States." *Id.* The pertinent facts are as follows:

- Beginning in September 2013, ANMM initiated negotiations in Massachusetts with a request to WHOI to borrow the Submersible. *Land Dec.* at ¶8; *Munier Dec.* at ¶7; *Tarantino Dec.* at ¶7.

- Over two years of extremely detailed negotiations between ANMM and WHOI followed, wherein the parties negotiated the loan's terms and conditions, including, *inter alia* care for the Submersible while in ANMM's care, custody, and control. *See generally Land Dec.*; *Munier Dec.*; *Tarantino Dec.*

- The negotiations between ANMM and WHOI included: multiple meetings in Woods Hole, Massachusetts between ANMM and WHOI personnel to discuss the terms and conditions of the loan; ANMM personnel inspecting the Submersible in Woods Hole, Massachusetts; extensive emails between ANMM and WHOI; and, numerous lengthy and detailed telephone conferences and conference calls between ANMM and WHOI personnel. *Id.*

- ANMM also made payments under the Loan Agreement by way of wire transfer to WHOI's bank account located in Massachusetts. *Land Dec.* at ¶12; *Munier Dec.* at ¶11; *Tarantino Dec.* at ¶11.

- Upon conclusion of these lengthy negotiations, on June 24, 2015, ANMM's Chief Executive Officer, Kevin Sumption signed the thirty-six (36) page Loan Agreement for the Submersible. Upon receipt of the executed Loan Agreement,

WHOI also executed the Loan Agreement. *Land Dec.* at ¶10 & ¶46; *Munier Dec.* at ¶9 & ¶46; *Tarantino Dec.* at ¶9 & ¶45.

- Under the Loan Agreement, ANMM undertook, *inter alia,* be responsible for collecting the Submersible at Woods Hole Oceanographic Institution, in Woods Hole, Massachusetts at the loan period's inception, and for returning it to Woods Hole, Massachusetts in undamaged condition upon the loan period's termination. *Land Dec.* at ¶13; *Munier Dec.* at ¶12; *Tarantino Dec.* at ¶12.

- On July 22, 2015, pursuant to the Loan Agreement, ANMM took care custody and control of the Submersible in Woods Hole, Massachusetts. *Land Dec.* at ¶14; *Munier Dec.* at ¶13; *Tarantino Dec.* at ¶13.

- On July 23, 2015, while in ANMM's care, custody and control, the Submersible was damaged by fire, and ANMM was in breach of the Loan Agreement. *Id.*

- After the damage to the Submersible, ANMM made visits to Massachusetts and the United States to assess the damage to the Submersible. *Land Dec.* at ¶75-76; *Munier Dec.* at ¶74-75; *Tarantino Dec.* at ¶73-74; *Blatchley Dec.* at ¶13.

- The Loan Agreement calls for the application of Massachusetts law. *Land Dec.* at ¶47; *Munier Dec.* at ¶47; *Tarantino Dec.* at ¶46.

These facts demonstrate the substantial nexus between ANMM's commercial activity and the United States. *See Universal Trading & Inv. Co., Inc.*, 727 F.3d at 26 (*citing Santos v. Compagnie Nationale Air France,* 934 F.2d 890, 894 (7th Cir.1991) (stating that an employment contract made in the United States for foreign employment provides jurisdiction for a claim for breach of that agreement since the plaintiff claims a breach of duty that arose within the United States); *Terenkian v. Republic of Iraq,* 694 F.3d 1122, 1137 (9th Cir.2012) (finding the nexus requirement satisfied where "substantial prior contractual negotiations ... occurred within the United States."); *Zedan v. Kingdom of Saudi Arabia,* 849 F.2d 1511, 1513 (D.C.Cir.1988) (citing H.R.Rep. No. 1487, 94th Cong., 2d Sess. 17 (1976), as stating that the nexus requirement may be met in "cases based on commercial transactions performed in whole or in part in the United States.")).

Even if the Court was to find that ANMM's alleged commercial activity was not "carried on in the United States," sufficient facts were alleged to establish a nexus based on ANMM's activity "outside the territory of the United States in connection with a commercial activity ... [that] causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2).  This is because ANMM's act in breaching the Loan

Agreement caused a "direct effect" in the United States. The breach caused financial harm to WHOI in the form of destruction of its valuable property – the Submersible. *Universal Trading & Inv. Co., Inc.*, 727 F.3d at 26–27 (holding that financial harm suffered by an American company was sufficient to create a direct effect to meet the requirements of the commercial activity exception to the FSIA) (*citing Byrd v. Corporación Forestal y Industrial de Olancho S.A.,* 182 F.3d 380, 390–91 (5th Cir.1999) (holding that an American company suffering financial harm after a Honduran public entity breached its contract created a "direct effect" sufficient for jurisdiction); *Voest–Alpine Trading USA Corp. v. Bank of China,* 142 F.3d 887, 896 (5th Cir.1998) (holding that an American company's "nontrivial financial loss in the United States in the form of funds not remitted to its account at a Texas bank" was a direct effect)). Additionally, the breach resulting in the damage to the Submersible caused a direct effect as it caused catastrophic damage to a vehicle on a highway in the United States. *Land Dec.* at ¶14; *Munier Dec.* at ¶13; *Tarantino Dec.* at ¶13.

## II.     The FSIA Waiver Exception Applies

ANMM waived its rights to sovereign immunity when it agreed to a Massachusetts choice of law provision and London Arbitration clause in the Loan agreement.

The FSIA allows a foreign sovereign to waive its sovereign immunity either expressly or implicitly. 28 U.S.C. § 1605(a)(1) (stating that a "foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case (1) in which the foreign state has waived its immunity either explicitly or by implication...") Indeed, the District of Massachusetts has noted that "[c]ourts have found implied waiver in…circumstances mentioned in the legislative history," including "where the foreign state has agreed to arbitrate in another country, and where the foreign state has agreed that the law of another country should govern the contract…" *Universal Trading & Inv. Co., Inc. v. Bureau for Representing Ukrainian Interests in Intern. and For. Courts*, 898 F. Supp. 2d 301, 311 (D. Mass. 2012), *aff'd*, 727 F.3d 10 (1st Cir. 2013)

In applying this exception, the Second Circuit, relying on language in the House Conference Report on the FSIA, has noted that a waiver will be found where a foreign state has agreed that the law of

a particular country shall govern. *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1017 (2d Cir. 1993). The Ninth Circuit has agreed, holding that "at the very least it is clear that a sovereign party has waived immunity where a contract *specifically* states that the laws of a jurisdiction within the United States are to govern the transaction." *Joseph v. Office of Consulate General of Nigeria*, 830 F.2d 1018, 1022 (9th Cir.1987).

Here, it is undisputed that the Loan Agreement specifically provides that "[t]his Agreement is governed by, and must be construed in accordance with, the laws of Massachusetts irrespective of its choice of law provisions." Docket No. 51-2, p. 23. Accordingly, by agreeing that the laws of Massachusetts would govern the Loan Agreement, ANMM has waived its claim of sovereign immunity. *See, e.g.*, *Marlowe v. Argentine Naval Com'n*, 604 F.Supp. 703, 708 (D.D.C. 1985) (holding that by stipulating in an aircraft sale contract that the law of the District of Columbia would apply a foreign sovereign made an implied waiver of sovereign immunity under the FSIA).

### III.    ANMM has not discharged its burden to prove it is an agent or instrumentality of Australia, and a factual issue remains

ANMM, as the moving party, has not discharged its burden to prove that ANMM is entitled to immunity as an agent or instrumentality of Australia.

"The defendant must present a <u>prima facie</u> case that it is a foreign sovereign…" *Virtual Countries, Inc., v. Republic of S. Africa*, 300 F.3d 230, 241 (2d Cir. 2002) "The FSIA provides immunity to foreign states and their 'agencies and instrumentalities.' 28 U.S.C. §§ 1603, 1604." *Cutcliffe v. University of Ulster*, No. 1:12-cv-00193-DBH, 2013 U.S. Dist. LEXIS 81336, at *1 (D. Me. Feb. 5, 2013); *Supra Med. Corp.* v. *McGonigle*, 955 F. Supp. 374, 375 (E.D. Pa. 1997)

An agency or an instrumentality for the purposes of foreign immunity is defined as an entity: 1) which is a separate legal person, corporate or otherwise, and 2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and, 3) which is neither a

citizen of a State of the United States as defined in section 1332(c) and (e) of this title [28 USCS § 1332(c) and (e)] nor created under the laws of any third country. 28 U.S.C.S. § 1603(b).

In *Supra Med. Corp.* v. *McGonigle*, the court held that medical and dental schools established by Parliament and seventy percent funded by the public were not an instrumentality of the government. 955 F. Supp. 374, 375 (E.D. Pa. 1997). The court reasoned that there was no national purpose to the schools' research, the government treated the schools as separate entities, and the schools' Council of Governors was selected by private individuals within the schools and had responsibility for the schools' debts, contractual obligations, and lawsuits. *Id.* at 379.

Whether the ANMM is an agent or instrumentality of Australia entitled to immunity is a factual issue. The Defendant has not met its burden of presenting a prima facie case that it is a foreign sovereign. Therefore, the Defendant is not entitled to immunity as an agent instrumentality of Australia.

## STANDARD OF REVIEW FOR MOTION TO DISMISS REGARDING PERSONAL JURISDICTION

 "When a district court rules on a motion to dismiss for lack of personal jurisdiction…the 'prima facie' standard governs its determination." *U.S. v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 618 (1st Cir. 2001). Under this standard, the plaintiff must "proffer evidence, which taken at face value, suffices to show all facts essential to personal jurisdiction." *Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*, 825 F.3d 28, 34 (1st Cir. 2016). The Court will "take the facts from the pleadings and whatever supplemental filings (such as affidavits) are contained in the record, giving credence to the plaintiff's version of genuinely contested facts." The Court will "then add to the mix facts put forward by the defendants, to the extent that that they are uncontradicted." *N. Laminate Sales, Inc. v. Davis*, 403 F.3d 14, 24 (1st Cir. 2004) (*quoting Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 51 (1st Cir. 2002)(additional quotations and citation omitted).

I.   **There is Personal Jurisdiction over ANMM as an exception to jurisdictional immunity under FSIA applies and ANMM has been properly served with process**

Under the FSIA, "federal courts are empowered to exercise personal jurisdiction over a foreign sovereign when two conditions obtain: (1) an exception from jurisdictional immunity established by the

FSIA applies, and (2) the sovereign has been served with process in accordance with the FSIA's provisions." Docket No. 61-1, p. 3 Fn. 2; *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 104 (2d Cir. 2017)(citing 28 U.S.C. § 1330(b)); *see also Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1020 (2d Cir. 1991) ("Under the FSIA personal jurisdiction [over a foreign sovereign] equals subject matter jurisdiction plus valid service of process").

As outlined above, at least one exception from jurisdictional immunity established by the FSIA applies. In addition, ANMM has been served with process via The Hague Convention. Indeed, ANMM raises no objection to service.

## II.    ANMM is subject to Personal Jurisdiction under a traditional Due Process analysis

To the extent applicable, this Honorable Court should properly make the decision that personal jurisdiction requirements of the Due Process Clause are satisfied.

For purposes of the specific jurisdiction analysis, the First Circuit has "broken the minimum contacts analysis into three categories – relatedness, purposeful availment, and reasonableness[.]" *Adelson v. Hananel*, 510 F.3d 43, 49 (1st Cir. 2007). Thus, as the First Circuit has explained:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's court foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

*Id.* (quoting *Daynard*, 290 F.3d at 60) (additional citations omitted).

WHOI has met its burden of establishing both relatedness and purposeful availment. Moreover, the application of the Gestalt factors to the facts of this case compels the conclusion that this Honorable Court's assertion of personal jurisdiction over ANMM is reasonable.[5]

---

[5] Recently, the First Circuit "suggested that Massachusetts's long –arm statute might impose more restrictive limits on the exercise of personal jurisdiction than does the Constitution." *Copia Commc'nc, LLC v. AMResorts, L.P.,* 812 F.3d, 1, 4 (1st Cir. 2016). More recently, however, the Massachusetts Appeals Court continued to follow Supreme Judicial Court precedent holding that the Massachusetts long-arm statute allows for "an assertion of jurisdiction over the person to the limits allowed by the Constitution of the United States," and analyzed only the constitutional limits for personal jurisdiction. *Open Risk, LLC v. Roston*, 90 Mass. App. Ct. 1107, 59 N.E.3d 456 (Table), No. 15-P-1282, 2016 WL 5596005, at * 4 (Sept. 29, 2016). Consequently, this Court continues to "sidestep the statutory inquiry and

### A. Relatedness

The relatedness inquiry "is to be resolved under 'a flexible standard.'" *Baskin-Robbins Franchising, LLC*, 825 F.3d at 35 (*quoting Pritzker v. Yari*, 42 F.3d 53, 61 (1st Cir. 1994). In the instant case, WHOI asserts claims against both ANMM for breach of the Loan Agreement and breach of bailment. Docket No. 1. In contract cases, the Court must determine whether the defendant's contacts with the forum were instrumental either in the formation of the contract or in its breach. *Philips Exeter Academy v. Howard Phillips Fund, Inc.*, 196 F.3d 284, 289 (1st Cir. 1999).

Over a period of years, ANMM and WHOI discussed and negotiated the loan of the Submersible and its transport from Massachusetts to Australia. *Land Dec.* at ¶8; *Munier Dec.* at ¶7; *Tarantino Dec.* at ¶7. The negotiations between ANMM and WHOI were performed through numerous email correspondence, lengthy conference call discussions, and in person meetings and viewings of the Submersible when ANMM representatives came to Massachusetts. *See generally Land Dec.*; *Munier Dec.*; *Tarantino Dec.* Eventually, ANMM and WHOI executed the Loan Agreement for the Submersible. *Land Dec.* at ¶¶44-46; *Munier Dec.* at ¶¶44-46; *Tarantino Dec.* at ¶43-45. The Loan Agreement, which the parties agreed was governed by Massachusetts law, required ANMM to arrange for the collection of the Submersible in Massachusetts. *Land Dec.* at ¶12 & 47; *Munier Dec.* at ¶13 & 47; *Tarantino Dec.* at ¶12 & 46. The Loan Agreement also required ANMM to insure against the Submersible's damage or loss after "collection" in Massachusetts and until "return" to Massachusetts. *Id.*

ANMM, through its agent, arranged for the transport of the Submersible from Woods Hole, Massachusetts to Baltimore, Maryland by truck. *Land Dec.* at ¶60-61; *Munier Dec.* at ¶60-61; *Tarantino Dec.* at ¶59-60. ANMM, through its agent, also arranged for cargo insurance to provide coverage for loss or damage to the Submersible during its carriage from Massachusetts. Docket No. 61-1. A New England surveyor appointed by ANMM's agent inspected the Submersible in Massachusetts prior to the Submersible's loading on the truck for carriage. *Land Dec.* at ¶58-59; *Munier Dec.* at ¶58-59; *Tarantino*

---

proceed and proceed directly to the constitutional analysis." *Bohnenberger v. MCBC Hydra Boats, LLC*, Civil Action No. 16-11368, 2017 A.M.C. 2390, 2398 & n. 7 (D. Mass. 2017).

*Dec.* at ¶57-58. ANMM directed communications, its employees, and its agents into Massachusetts in order to negotiate the Loan Agreement and arrange for the carriage of the Submersible from Woods Hole, Massachusetts to Baltimore, Maryland. *See generally Land Dec.*; *Munier Dec.*; *Tarantino Dec*. In addition, ANMM, through its agent, issued a "RIUSA TRUCK BILL OF LADING" in Massachusetts and which was purportedly signed by Douglas Handy of WHOI and ANMM's agent in Massachusetts. *Land Dec.* at ¶61; *Munier Dec.* at ¶61; *Tarantino Dec.* at ¶60. ANMM initiated certain payments into Massachusetts pursuant to the Loan Agreement. *Land Dec.* at ¶12; *Munier Dec.* at ¶11; *Tarantino Dec.* at ¶11.

These facts are sufficient to satisfy the relatedness prong of the jurisdictional analysis.

**B. Purposeful Availment**

The evidence of ANMM's contacts with Massachusetts also fulfill the purposeful availment prong of the jurisdictional inquiry. "The purposeful availment inquiry…focuses on defendant's intentionality. This prong is only satisfied when the defendant purposefully and voluntarily directs his activities toward the forum so that he should expect, by virtue of the benefit he received, to be subject to the court's jurisdiction based on these contacts." *Swiss Am. Bank, Ltd.*, 274 F.3d at 623-24 (internal citation omitted). Accordingly, purposeful availment occurs "when a defendant deliberately targets its behavior toward the society or economy of a particular forum [such that] the forum should have the power to subject the defendant to judgment regarding that behavior." *Carreras v. PMG Collins, LLC*, 660 F.3d 549, 555 (1st Cir. 2011) (*citing J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 881 (2011)).

ANMM purposefully, voluntarily, and intentionally directed their activities at Massachusetts such that they should expect to be subject to this Honorable Court's jurisdiction. *See generally Land Dec.*; *Munier Dec.*; *Tarantino Dec*. ANMM reached out to WHOI in Massachusetts to propose that WHOI loan the Submersible to ANMM. *Land Dec.* at ¶8; *Munier Dec.* at ¶7; *Tarantino Dec.* at ¶7. Prior to the execution of the Loan Agreement, ANMM employees came into Massachusetts to discuss the Loan Agreement and the transport of the Submersible from Massachusetts. *See generally Land Dec.*; *Munier Dec.*; *Tarantino Dec*.

Later, ANMM voluntarily, and for payment, entered into a Loan Agreement and agreed to arrange for the carriage of the Submersible originating in Massachusetts. *Id.* This action alone is sufficient to support the conclusion that ANMM purposefully and voluntarily directed its activities towards Massachusetts and "should reasonably anticipate being haled into Court [in Massachusetts]." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (quotation and citation omitted). In addition, ANMM's agent arranged for insurance, which ANMM paid for, for the Submersible for the carriage originating in Massachusetts. Docket No. 61-1. ANMM's agent also appointed an agent surveyor to inspect the Submersible in Massachusetts, and directed their agent, ATS, to Massachusetts to pick up the Submersible. *Land Dec.* at ¶59-61; *Munier Dec.* at ¶59-61; *Tarantino Dec.* at ¶58-60. ANMM's agent also issued a "RIUSA TRUCK BILL OF LADING" in Massachusetts and which was purportedly signed by Douglas Handy of WHOI and Defendant, Sam Broughton Wright, Jr., in Massachusetts. *Land Dec.* at ¶61; *Munier Dec.* at ¶61; *Tarantino Dec.* at ¶60. ANMM also agreed that the Loan Agreement would be governed by Massachusetts law. *Land Dec.* at ¶47; *Munier Dec.* at ¶47; *Tarantino Dec.* at ¶46. Accordingly, ANMM's conduct meets the purposeful availment requirement of the jurisdictional test.

### C.  Gestalt Factors

Where, as here, the first two parts of the test for specific jurisdiction are fulfilled, the Court must determine whether the exercise of personal jurisdiction is reasonable in light of the five "Gestalt factors." *See Asahi Metal Industry Co., Ltd. v. Superior Court of California, Solano County*, 480 U.S. 102, 112 (1987).   What follows is a brief evaluation of each factor:

The first Gestalt factor is burden on the defendant in defending the lawsuit in the forum. *Id.* ANMM's burden in appearing would <u>not</u> be significant. ANMM asserts no special burden it would encounter in litigation out of state, nor does the record reveal a greater burden on ANMM appearing in Massachusetts than WHOI would suffer appearing in Australia or London. As ANMM "does not allege anything 'special or unusual' about its situation other than the ordinary inconvenience of litigating an action in another [place]," this factor weighs in favor of WHOI. *See Hasbro, Inc. v. Clue Computing, Inc.*, 994 F. Supp. 34, 45 (D. Mass. 1997).

18

The second factor is the forum state's interest in adjudicating the dispute. *Asahi Metal Industry Co., Ltd*, 480 U.S. at 112. Massachusetts courts have an interest in affording its non-profit corporations a convenient forum in which to bring their claims. Therefore, WHOI should be allowed to seek relief here, in Massachusetts, rather than face the application of Massachusetts law in an Australian court.

The third factor is the plaintiff's interest in obtaining convenient and effective relief. *Asahi Metal Industry Co., Ltd*, 480 U.S. at 112. The First Circuit has repeatedly observed that "a plaintiff's choice of forum must be accorded a degree of deference with respect to the issue of its own convenience." *Sawtelle v. Farrell*, 70 F.3d 1381, 1395 (1st Cir. 1995). Thus, this factor weighs in favor of maintaining the litigation in Massachusetts, where WHOI, as the natural plaintiff, is located and the contract is governed by Massachusetts law.

The fourth factor is the interstate judicial system's interest in obtaining the most effective resolution of the controversy and is generally considered "a wash." *Baskin-Robbins*, 825 F.3d at 41. It is not of particular issue here and does not weigh in favor of either party.

The final factor is the shared interests of the state in furthering substantive social policies. *Asahi Metal Industry Co., Ltd*, 480 U.S. at 112. As noted above, Massachusetts has a clear interest in affording its non-profit corporations a convenient forum in which to bring their claims. Massachusetts also has a clear interest in construing agreements which call for the application of its laws.

The Gestalt factors relevant to this case weigh in favor of jurisdiction (or are neutral), as such the maintenance of the lawsuit against ANMM in Massachusetts "would comport with 'fair play and substantial justice.'" *Burger King*, 471 U.S. at 476 (*quoting Int'l Shoe Co.*, 326 U.S. at 320).

As detailed above, the record shows that ANMM established minimum contacts in Massachusetts such that this Honorable Court's exertion of personal jurisdiction over ANMM would not offend due process.

## CONCLUSION

WHEREFORE, Plaintiff, Woods Hole Oceanographic Institution, prays that this Honorable Court deny Defendant Australian National Maritime Museum's Motion to Dismiss for lack of subject matter jurisdiction and lack of personal jurisdiction at Docket No. 50.

Respectfully submitted,
The Plaintiff,
By its attorneys,


/s/ Samuel P. Blatchley
Robert J. Murphy BBO# 557659
Samuel P. Blatchley BBO# 670232
Holbrook & Murphy
238-240 Lewis Wharf
Boston, MA  02110
(617) 428-1151
rmurphy@holbrookmurphy.com
sblatchley@holbrookmurphy.com


## CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2018, I electronically filed the within document with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all parties listed on the electronic service list within the CM/ECF system.

/s/ Samuel P. Blatchley
Samuel P. Blatchley BBO # 670232
Holbrook & Murphy
238-240 Lewis Wharf
Boston, MA 02110
(617) 428-1151
sblatchley@holbrookmurphy.com