UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| WOODS HOLE OCEANOGRAPHIC ) | |
| INSTITUTION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 17-12301-NMG |
| ) | |
| ATS SPECIALIZED, INC., et al., ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

REPORT AND RECOMMENDATION ON DEFENDANTS' MOTIONS TO DISMISS
[Docket Nos. 20, 22, 27, 32, 50]

February 5, 2019

Boal, M.J.

This action arises from the transportation of a submarine from Woods Hole,

Massachusetts to Australia that took place under an agreement by plaintiff Woods Hole

Oceanographic Institution ("Woods Hole") to loan the submarine to the Australian National

Maritime Museum (the "Museum").  During transit, the submarine caught fire in Connecticut

and was allegedly damaged.  Woods Hole brings claims against the Museum and against several

defendants allegedly involved in the transportation of the submarine.  The Museum and

defendants ATS Specialized, Inc. ("ATS"), Sam Broughton Wright, Jr. ("Wright"),[1] Ridgeway

International USA, Inc. ("Ridgeway"), and Guy Tombs Limited ("Guy Tombs") have moved to

_____

[1] At the January 23, 2019 hearing, Woods Hole indicated that it did not oppose dismissing
Wright from the action and none of the remaining defendants objected.  Accordingly, this Court
recommends that the District Judge grant Wright's motion to dismiss.

dismiss the claims against them.  Docket Nos. 20, 22, 27, 32, 50.[2, 3]  This Court heard oral

argument on January 23, 2019.  For the following reasons, this Court recommends that the

District Judge assigned to this case deny the Museum's motion to dismiss, grant in part and deny

in part ATS's motion to dismiss, grant Wright's motion to dismiss, grant in part and deny in part

Ridgeway's motion to dismiss, and grant Guy Tombs' motion to dismiss.

I.     FACTUAL BACKGROUND[4]

      A.     The Parties

      1.     Woods Hole

      Woods Hole is a nonprofit corporation, organized and existing under the laws of the

Commonwealth of Massachusetts.  Complaint ¶ 1.  Woods Hole is dedicated to research and

education to advance understanding of the ocean and its interaction with the Earth system, and to

communicating this understanding for society's benefit.  Id.

      Woods Hole has vast knowledge, experience, and proficiency exploring, diving,

discovering, and operating in the deepest regions of the sea.  Id. at ¶ 2.  For over a half-century,

Woods Hole has been building, operating, maintaining, managing, and repairing submersibles.

Id.

      Woods Hole is the owner of a human occupied vehicle ("HOV"), the Deep Sea

Challenger, a custom-designed and built submersible capable of reaching full-ocean depth (the

---

[2] On September 19, 2018, Judge Gorton referred the motions to the undersigned for a report and recommendation.  Docket No. 67.

[3] Citations to "Docket No. ___" are to documents appearing on the Court's electronic docket. They reference the docket number assigned by CM/ECF, and include pincites to the page numbers appearing in the top right corner of each page within the header appended by CM/ECF.

[4] This Court has considered the facts in accordance with the applicable standard of review for each of the motions as set forth below.

"Submersible").  Id. at ¶ 3.  Woods Hole alleges that, prior to the loss which is the subject matter of this case, the Submersible was valued in excess of $30 million.  Id. at ¶ 7.

    2.    <u>ATS Specialized</u>

ATS Specialized is a corporation organized and existing under the laws of the State of Minnesota, with a principal place of business in St. Cloud, Minnesota.  Id. at ¶ 9.

    3.    <u>Wright</u>

Wright is a resident and domiciliary of the State of South Carolina.  Id. at ¶ 10.  Wright was driving the truck transporting the Submersible when it caught on fire.  Id. at ¶¶ 41-42.

    4.    <u>Ridgeway</u>

Ridgeway is a New York corporation with its principal place of business in Plattsburgh, New York.  Declaration of Guy M. Tombs in Support of Co-Defendant Ridgeway International USA Inc.'s Motion to Dismiss the Complaint (Docket No. 29) ("Tombs Ridgeway Decl.") at ¶ 3; <u>see</u> <u>also</u> Complaint at ¶ 11.

Ridgeway specializes in arranging for the transport of cargo, particularly explosives, munitions and security classified cargo.  Tombs Ridgeway Decl. at ¶ 4.  Ridgeway does not have, and has never had, an office in Massachusetts.  Id. at ¶ 5.  Ridgeway is not registered, and has never been registered, to do business in Massachusetts.  Id. at ¶ 6.  It has no officers, managers or directors in Massachusetts.  Id. at ¶ 8.  Ridgeway has no property or bank accounts in Massachusetts.  Id. at ¶¶ 11, 16, 17.

Ridgeway has never directed advertisements specifically targeting residents of Massachusetts.  Id. at ¶ 18.  It does not derive any substantial revenue from goods used or consumed, or services rendered, in Massachusetts.  Id. at ¶ 19.

5.    Guy Tombs

Guy Tombs is a Canadian corporation with its principal place of business in Montreal, Quebec, Canada.  Declaration of Guy M. Tombs in Support of Co-Defendant Guy Tombs Limited's Motion to Dismiss the Complaint (Docket No. 34) ("Tombs GT Decl.") at ¶ 3; see also Complaint at ¶ 12.  Guy Tombs specializes in arranging for transportation of conventional and over dimensional cargo.  Tombs GT Decl. at ¶ 4.

Guy Tombs does not have, and has never had, offices in Massachusetts.  Id. at ¶ 5.  It is not registered, and has never been registered, to do business in Massachusetts.  Id. at ¶ 6.  Guy Tombs has no property, assets or bank accounts in Massachusetts.  Id. at ¶¶ 11, 16, 17.

Guy Tombs has no employees in Massachusetts.  Id. at ¶ 20.  It does not direct any advertisement at Massachusetts' residents and does not derive any substantial revenue from goods used or consumed, or services rendered, in Massachusetts.  Id. at ¶¶ 18-19.

6.    The Museum

The Museum was established in 1990 by the Australian National Maritime Museum Act 1990.  Declaration of Peter Rout (Docket No. 51-1) ("Rout Decl.") at ¶ 3.  By the law passed by the Australian Parliament, the Museum was established as a corporation and empowered "to act on behalf of the Commonwealth" of Australia.  Id. The Museum is wholly owned by the Australian government.  Id.; Docket No. 52.

The functions of the Museum are to exhibit material included in the national maritime collection of Australia, and maritime cultural and historical material loaned to the Museum; to develop, preserve and maintain the national maritime collection of Australia; to disseminate information relating to Australian maritime history; and to conduct for and arrange for research into matters relating to Australian maritime industry.  Rout Decl. at ¶ 4.

The Museum is funded by the Australian government, operates on a not-for-profit basis, and does not make a profit.  Id. at ¶ 5.  All shares in the Museum are owned by the Australian government.  Id.

The Museum does not operate in Massachusetts and does not benefit from conduct that takes place in Massachusetts.  Id. at ¶ 6.  Besides the loan of the Submersible at issue in this case, the Museum has never borrowed any historical or cultural item from a person or entity in Massachusetts.  Id. at ¶ 10.  In addition, the Museum has never lent any item to any museum in Massachusetts.  Id.

The Museum does not purchase or sell any goods in Massachusetts.  Id. at ¶ 12.  It does not advertise or distribute any marketing materials in Massachusetts.  Id. at ¶ 13.

The Museum has no employees, offices, warehouse, manufacturing or distribution facilities, bank accounts or any other assets in Massachusetts.  Id. at ¶¶ 14, 20-22.

B.    The Loan Agreement

Beginning in September 2013, the Museum contacted Woods Hole with a request to borrow the Submersible.  Declaration of Christopher Land, Esq. (Docket No. 63-1) ("Land Decl.") at ¶ 8; Declaration of Robert S.C. Munier (Docket No. 63-2) ("Munier Decl.") at ¶ 7; Declaration of Anthony Tarantino (Docket No. 63-3) ("Tarantino Decl.") at ¶ 7.  Over two years of detailed negotiations between the Museum and Woods Hole followed, wherein the parties negotiated the loan's terms and conditions, including but not limited to price, insurance, indemnity, choice of law, shipping terms and instructions, controls, required reports, communications, and care for the Submersible while in the Museum's care, custody, and control. Id.

The negotiations between the Museum and Woods Hole included multiple meetings in

Woods Hole, Massachusetts between the Museum and Woods Hole personnel to discuss the terms and conditions of the loan; Museum personnel inspecting the Submersible in Woods Hole, Massachusetts; extensive emails between the Museum and Woods Hole; and numerous telephone conferences between Museum and Woods Hole personnel.  Land Decl. at ¶¶ 8-9, 16-44; Munier Decl. at ¶¶ 8, 16-45; Tarantino Decl. at ¶ 8; 16-45.

Among other things, on or about May 23, 2014, the Museum's Mike Harvey traveled to Woods Hole, Massachusetts to discuss the loan of the Submersible, including costs, fees, logistics, scope, future action, and the operative timetable.  Land Decl. at ¶ 22; Munier Decl. at ¶ 21; Tarantino Decl. at ¶ 21.  During this meeting, Mr. Harvey indicated that the Museum had an annual budget of approximately $20 million to $25 million, with approximately $800,000 to spend on exhibits.  Id.  On May 24, 2014, Mr. Harvey personally inspected the Submersible in Woods Hole, Massachusetts.  Land Decl. at ¶ 23; Munier Decl. ¶ 22; Tarantino Decl. at ¶ 22.

The parties executed an Inward Loan Agreement for the Loan of Objects from the Woods Hole Oceanographic Institution (WHOI) to the Australian National Maritime Museum (ANMM) dated June 30, 2015 (the "Loan Agreement").  Docket No. 63-4.  The Loan Agreement was subsequently amended by a Variation Agreement, which forms part of the Loan Agreement. Rout Decl. at ¶ 7; Munier Decl. at ¶ 45; Tarantino Decl. at ¶ 45.

Pursuant to the Loan Agreement, for a payment of $30,000, Woods Hole agreed to loan the Submersible to the Museum from June 30, 2015 to June 1, 2020, although Woods Hole agreed to consider extending the date of the loan for "an undetermined period of time."  Docket No. 63-4 at 4, 22.  The Museum was responsible for collecting from and returning the Submersible from Woods Hole, Massachusetts.  Id. at 3-4.

The Loan Agreement also provided that, while in its possession or control, the Museum

would "take care of the [Submersible] in accordance with the professional standards appropriate," and would "not do or permit anything which may endanger the safety of the [Submersible] or the preservation of its quality, or which may cause any damage or deterioration to the [Submersible]." Id. at 6.  In addition, the Museum agreed to insure the Submersible "against all risks and 'wall to wall' from the time the Submersible is in the Museum's possession or control." Id. at 8.  The parties agreed to indemnify each other against all "actions, claims, suits, demands, liabilities, losses, damages and costs (including all legal costs on a solicitor-client basis) directly or indirectly arising out of, relating to or any way connected with any breach of [the Loan Agreement] by it or of any of its promises and warranties in [the Loan Agreement]." Id. at 11.

The parties agreed that the Loan Agreement would be governed by the law of Massachusetts.  Docket No. 63-4 at 23.  If any disputes arose between the parties, they were to make "reasonable efforts to resolve the dispute by good faith negotiation." Id. at 12.  If mediation was not successful, either party could refer the matter to arbitration under the Rules of Arbitration of the International Chamber of Commerce.  Id. at 22.  Such arbitration was to be conducted in London, unless otherwise agreed by the parties.  Id.

C.      Transport And Damage To The Submersible

The Museum engaged Ridgeway to manage the pickup and transport of the Submersible to Australia.  Rout Decl. at ¶ 29; Munier Decl. at ¶ 56; Tarantino Decl. at ¶ 55.  On or about March 7, 2015, Peter Rout, Assistant Manager of Operations for the Museum, signed a Power of Attorney Designation as Export Forwarding Agent and Acknowledgement of Terms and Conditions" (the "Power of Attorney").  Rout Decl. at ¶ 32; Tarantino Decl. at ¶ 56; Tombs Ridgeway Decl. at ¶ 26.  Pursuant to the Power of Attorney, the Museum appointed Ridgeway,

its officers, employees, and/or agents to act on its behalf "as a true and lawful agent" of the Museum.  Docket No. 51-4 at 2.

The Museum itself arranged for sea carriage for the Submersible with Wallenius Willhemsen Logistics ("Wallenius"), which was to commence in Baltimore, Maryland.  Tombs Ridgeway Decl. at ¶ 22.  On behalf of the Museum, Ridgeway arranged with ATS[5] for the carriage of the Submersible from Massachusetts to Baltimore.[6]  Id. at ¶ 28.  Ridgeway also asked Guy Tombs to arrange for cargo insurance to cover the Submersible's transportation from Woods Hole to Australia.  Id. at ¶ 30.  Guy Tombs contacted Assurances Fort Insurance in Montreal, which in turn, arranged for a cargo policy, policy # 50T 0845 (the "Cargo Policy"), from Eagle Underwriting Group Inc. ("Eagle").[7]  Tombs GT Decl. at ¶ 23.  Ridgeway charged the Museum for the cost of the Cargo Policy.  Tombs Ridgeway Decl. at ¶ 30.

On or about July 22, 2015, Ridgeway issued a Truck Bill of Lading, terms prepaid (the "Ridgeway Truck Bill of Lading").  Complaint at ¶ 32; see also Tombs Ridgeway Decl. at ¶ 28. The Ridgeway Truck Bill of Lading indicated a pick up date of July 22, 2015 and a delivery date of July 23, 2015.  Complaint at ¶ 32.  It also indicated that the Submersible was to be delivered

---

[5] In Guy Tombs' declaration in support of Ridgeway's motion to dismiss, he refers to Anderson Trucking Services, Inc. ("Anderson").  Tombs Ridgeway Decl. at ¶ 28.  Woods Hole, on the other hand, alleges that Ridgeway engaged ATS to prepare and transport the Submersible. Complaint at ¶ 33.  At the hearing, there was some confusion as to whether ATS and Anderson are the same company or separate but affiliated companies.  It is not necessary to resolve this issue for purposes of the instant motions.

[6] All of Ridgeway's communications concerning arranging with ATS for the transport of the Submersible from Woods Hole's facility to the intended load port in Maryland were conducted from Ridgeway's offices in New York.  Tombs Ridgeway Decl. at ¶ 29.

[7] All of Guy Tombs' communications with Fort Insurance and Eagle to arrange for the Cargo Policy were conducted from Guy Tombs' offices in Montreal, Canada.  Guy Tombs GT Decl. at ¶ 24.

to Baltimore, Maryland.  Id.  The Ridgeway Truck Bill of Lading contained no terms, conditions, or provisions concerning limitation of liability or choice of law.  Id.  Prior to the loss which is the subject matter of the Complaint, Ridgeway did not issue any other document purporting to govern, control, reflect, or memorialize the contract of carriage.  Id.

On or about July 22, 2015, ATS took possession of the Submersible, which was in good order and condition, and loaded it onto its truck for transport from Woods Hole, Massachusetts to Baltimore, Maryland.  Complaint at ¶ 37; see also Tombs Ridgeway Decl. at ¶ 31.  Ridgeway maintains that none of its employees had any direct involvement in the loading or the transportation of the Submersible.  Tombs Ridgeway Decl. at ¶ 31.  Ridgeway also maintains that none of its employees were present when the Submersible was loaded on the truck or during the transport of the Submersible.  Id.  Ridgeway appointed an independent surveyor who inspected the Cargo before it was loaded at Woods Hole's facilities.  Id.

Approximately one hour after departing Woods Hole, Massachusetts, en route to Baltimore, Maryland, the truck transporting the Submersible experienced a single tire blow out while driving northbound on Interstate 495 near Middleborough, Massachusetts.  Complaint at ¶ 38.  Following the tire blow out, Service Tire Truck Center, Inc. ("STTC") inspected, serviced and repaired the truck.  Id. at ¶ 39.  Woods Hole alleges that STTC "implicitly or explicitly certified and declared that the Truck was safe and appropriate for the transport" of the Submersible.  Id.

After STTC replaced the truck's damaged tire, the truck proceeded to a TravelCenters facility in Greenwich, Rhode Island, where Wright and the truck spent the night.  Id. at ¶ 41.  On or about July 23, 2015, after departing the TravelCenters facility in Greenwich, Rhode Island, en route to Baltimore, the truck caught fire, burning the Submersible, and causing it massive

damage.  Id. at ¶ 42.  Woods Hole alleges that the defendant carriers did not make delivery or return of the Submersible in like good order and condition as when shipped to, delivered to, or received by them, but made delivery of the Submersible in damaged condition.  Id. at ¶ 44.

      D.      The Connecticut Action

On May 17, 2017, Anderson filed a complaint for declaratory judgment in the United States District Court for the District of Connecticut.  Anderson Trucking Servs., Inc. v. Eagle Underwriting Group, Inc., et al., No. 3:17-cv-00817 (D. Conn.) (the "Connecticut Action"). Anderson named Woods Hole, the Museum, Ridgeway, and Eagle as defendants in the Connecticut Action.  Anderson sought a declaration that it is not liable for any damage incurred by the Submersible; or in the event it is found liable for such damage, its liability is limited.

On August 23, 2018, Senior District Judge Charles S. Haight, Jr. dismissed the claims against Woods Hole, Ridgeway, and Eagle for lack of personal jurisdiction.  Judge Haight denied the Museum's motion to dismiss without prejudice to renewal and allowed Anderson to conduct jurisdictional discovery.  Judge Haight also questioned whether the Connecticut Action should proceed, or whether, in the interests of justice, it should be dismissed or transferred given the parallel action pending in this Court.  Subsequently, Judge Haight directed the parties to file a notice as to the disposition of the motions to dismiss pending before this Court and whether Anderson still intended to pursue its claims against the Museum in the Connecticut Action.[8]

---

[8] ATS and Ridgeway had moved to dismiss this case pursuant to the "prior pending action" doctrine.  Docket No. 21 at 3-6; Docket No. 30 at 16-18.  At the January 23, 2019 hearing, their counsel indicated that, in light of Judge Haight's rulings in the Connecticut Action, they no longer press this argument.

E.     The Complaint

The Complaint contains seventeen counts.  Among other things,[9] Woods Hole brings Carmack Amendment, breach of bailment obligations, negligence, and unfair and deceptive practices claims against ATS, Ridgeway, and Guy Tombs.  Complaint at ¶¶ 62-140.  It also brings claims for breach of contract against Guy Tombs.  Id. at ¶¶ 141-146.  As to the Museum, Woods Hole has brought claims for breach of contract and breach of bailment obligations.  Id. at ¶¶ 147-163.  Finally, Woods Hole brings claims for negligence and breach of bailment against Wright.  Id. at ¶¶ 164-175.

F.     The Motions To Dismiss

Defendants ATS, Wright, Ridgeway, Guy Tombs, and the Museum have moved to dismiss the claims against them.  Docket Nos. 20, 22, 27, 32, and 50.  Defendants ATS and Wright argue that Woods Hole's state law claims are preempted by the Carmack Amendment. Docket No. 21 at 6-11.  ATS also argues that Woods Hole's claim for unfair and deceptive practices is preempted by the Interstate Commerce Commission Termination Act and the Federal Aviation Administration Authorization Act.  Docket No. 21 at 12-15.

Rigdeway and Guy Tombs argue that the Court lacks personal jurisdiction over them. Docket No. 30 at 6-12; Docket No. 33 at 4-12.  In the alternative, they argue that the Complaint fails to state a claim against them.  Docket No. 30 at 12-14; Docket No. 33 at 13-17.  They also argue that the Cargo Policy Underwriters are indispensable parties and, to the extent that they cannot be joined in this action, the Complaint should be dismissed pursuant to Rule 19(b) of the Federal Rules of Civil Procedure.  Docket No. 30 at 15-16; Docket No. 33 at 17-18.

---

[9] This Court lists here only the claims against those defendants who have filed motions to dismiss.

Finally, the Museum argues that it is immune from suit under the Foreign Sovereign Immunities Act.  Docket No. 51 at 12-18.  It also argues that the allegations against it are factually wrong, id. at 18-20, and that it is not subject to personal jurisdiction by the Court.  Id. at 20-25.

Woods Hole has filed oppositions to all of the motions to dismiss.  Docket Nos. 42, 44, and 63.  ATS has also filed an opposition to Ridgeway's and the Museum's motions to dismiss.[10] Docket Nos. 41, 79.  Ridgeway, Guy Tombs, and the Museum have filed replies in support of their motions to dismiss.  Docket Nos.  48, 65, 86.

II.    ANALYSIS

 "[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)."  Sinochem Int'l Co., Ltd. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 430-31 (2007).  Therefore, the Court first addresses the jurisdictional issues.

A.    The Museum's Motion To Dismiss Based On The FSIA

The Museum argues that it is immune from suit under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1604 (the "FSIA") and, therefore, the Court lacks subject-matter jurisdiction over it.  Docket No. 51 at 12-18.  The FSIA "provides the sole basis for obtaining jurisdiction

---

[10] The Museum argues that ATS lacks standing to file its opposition because it does not have a cross-claim against the Museum.  Docket No. 86 at 2-3.  Some courts have held that co-defendants lack standing to oppose each other's motions unless a cross-claim is pending while other courts have rejected this approach as "unnecessarily myopic."  See Independent Living Center of Southern California v. City of Los Angeles, 205 F. Supp. 3d 1105, 1109 (C.D. Cal. 2016) (collecting cases).  This Court agrees with those courts that have considered co-defendant's opposing briefs when the parties are not "on opposites of the 'v.'"  Id.  Accordingly, the Court has considered ATS' opposition although it notes that it would have reached the same conclusions regardless of whether it considered ATS' brief.

over a foreign state in federal court." Univ. Trading & Inv. Co., Inc. v. Bureau for Representing Ukrainian Interests in Int'l and Foreign Courts, 727 F.3d 10, 16 (1st Cir. 2013) (quoting Argentine Republic v. Amerada Hess Shipping Co., 488 U.S. 428, 439 (1989)).  It establishes a presumption of foreign sovereign immunity from the jurisdiction of the courts of the United States unless one of its enumerated exceptions to immunity applies. Id. (citations omitted).  In the absence of such an exception, the district court lacks both subject-matter and personal jurisdiction over a suit against a foreign sovereign. Id. (citations omitted).

The First Circuit has not directly addressed the burdens of the parties with respect to a FSIA action. Id. at 17.  However, most circuits have adopted a burden-shifting framework. See Univ. Trading & Inv. Co. v. Bureau for Representing Ukrainian Interests in Int'l and Foreign Courts, 898 F. Supp. 2d 301, 309 (D. Mass. 2012) (citing cases).  Under that framework, "the defendant must present a *prima facie* case that it is a foreign sovereign; the plaintiffs then have the burden of production of offering evidence showing that, under exceptions to the FSIA, immunity should not be granted; and finally, the ultimate *burden of persuasion* remains with the alleged foreign sovereign to show that none of the pertinent exceptions applies." Id. (quoting Virtual Countries, Inc. v. Republic of S. Africa, 300 F.3d 230, 241 (2nd Cir. 2002) (emphasis in original; internal quotation marks omitted).  This Court will follow that framework here.

In considering a motion to dismiss on FSIA grounds, the "district court 'retains considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction.'" Freund v. Republic of France, 592 F. Supp. 2d 540, 553 (S.D.N.Y. 2008) (quoting APWU v. Potter, 343 F.3d 619, 627 (2nd Cir. 2003)).  "This discretion includes the ability to resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings, such as affidavits." Id. (citations and internal quotations marks omitted).  "[C]onsistent with foreign

sovereign immunity's basic objective, namely, to free a foreign sovereign from suit, the court should normally resolve those factual disputes and reach a decision about immunity as near to the outset of the case as is reasonably possible."  <u>Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.</u>, 137 S. Ct. 1312, 1317 (2017) (citing <u>Verliden B.V. v. Central Bank of Nigeria</u>, 461 U.S. 480, 493-494 (1983)).

     1.    <u>Whether The Museum Is A Foreign State</u>

The FSIA applies only to "foreign states."  28 U.S.C. § 1604.  The term "foreign state" is defined to include "a political subdivision of a foreign state or an agency or instrumentality of a foreign state."  28 U.S.C. § 1603(a).  Woods Hole argues that the Museum has not met its burden to prove that it is an agent or instrumentality of Australia.  Docket No. 63 at 13-14.  This Court disagrees.

An "agency or instrumentality of a foreign state" is defined as any entity:

(1) which is a separate legal person, corporate or otherwise, and
(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b).  The Museum has submitted the Declaration of Peter Rout, which shows that the Museum was established by the Australian Parliament as a corporation, and all of its shares are owned by the Australian government.  Rout Decl. at ¶ 3.  The Museum has therefore made a <u>prima facie</u> showing that it is an agent or instrumentality of Australia.  There is no evidence to the contrary in the record.  Accordingly, the Court finds that the Museum has met its burden and the burden shifts to Woods Hole to produce evidence that one of the exceptions to immunity applies.

2.     Commercial Activity Exception

Woods Hole and ATS argue that the commercial activity exception to the FSIA applies to the Museum.  Docket No. 63 at 5-12; Docket No. 79 at 3-7.  The FSIA provides that a foreign state shall not be immune from suit in the United States in any case:

> in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).  The parties dispute whether the action is based on a "commercial activity."

Section 1603(d) of the FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act.  The commercial character of the activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."  28 U.S.C. § 1603(d).  The Supreme Court has noted that this definition "leaves the critical term 'commercial' largely undefined," and instead "simply establishes that the commercial nature of an activity does *not* depend upon whether it is a single act or a regular course of conduct; and the second sentence merely specifies what element of the conduct defines commerciality (i.e., nature rather than purpose), but still without saying what 'commercial' means."  Univ. Trading & Inv. Co., Inc., 727 F.3d at 16 (emphasis in original) (quoting Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 612 (1992)).  Nevertheless, the Supreme Court did state that:

> [W]hen a foreign government acts, not as a regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are "commercial" within the meaning of the FSIA . . . [T]he question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives.  Rather, the issue

15

> is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'

Weltover, 504 U.S. at 614 (citations omitted; emphasis in original).  The Supreme Court offered the following example to highlight the distinction between commercial and sovereign activity:

> [A] foreign government's issuance of regulations limiting foreign currency exchange is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party; whereas a contract to buy army boots or even bullets is a 'commercial' activity, because private companies can similarly use sales contracts to acquire goods.

Id. at 614-615.  Further, the FSIA requires the Court to focus the commercial activity inquiry on the activities carried on "by the foreign state" upon which the civil action is based.  Univ. Trading & Inv. Co., Inc., 727 F.3d at 16-17 (citing 28 U.S.C. § 1605(a)(2)).  Therefore, this Court's inquiry will turn on "'the particular actions that the foreign state performs,' as opposed to the specific actions performed by the party with whom the foreign state contracted."  Id. at 17 (internal citation omitted).

The FSIA's "based upon" inquiry, "first requires a court to 'identify[] the particular conduct on which the [plaintiff's] action is 'based.'"  OBB Personenverkehr AG v. Sachs, 136 S. Ct. 390, 395 (2015) (citing Saudi Arabia v. Nelson, 507 U.S. 349, 356 (1993)).  The court "should identify that 'particular conduct' by looking to the 'basis' or 'foundation' for a claim, 'those elements . . . that, if proven, would entitle a plaintiff to relief,' and 'the gravamen of the complaint.'"  Id. (internal citations omitted).

Here, Woods Hole alleges that the Museum entered into the Loan Agreement, under which Woods Hole agreed to loan the Submersible to the Museum.  Complaint ¶ at 19.  Pursuant to the Loan Agreement, the Museum was responsible for the safe "[c]ollection and return" of the Submersible.  Id. at ¶ 20; Munier Decl. at ¶ 47; Tarantino Decl. at ¶ 47; Docket No. 63-4 at 4, 6-

7.  The Loan Agreement also required the Museum to insure against the Submersible's damage or loss after collection and return in Massachusetts.  Complaint at ¶ 25; Munier Decl. at ¶ 47; Tarantino Decl. at ¶ 47; Docket No. 63-4 at 8; 22.  The Museum engaged Ridgeway to assist in transporting the Submersible from Massachusetts to Australia.  Rout Decl. at ¶ 29; Tombs Ridgeway Decl. at ¶ 24.  Ridgeway, in turn, arranged with ATS to transport the Submersible on the ground portion of the journey, from Woods Hole, Massachusetts to Baltimore, Maryland.  Tombs Ridgeway Decl. at ¶ 28.  The Museum executed a Power of Attorney, granting Ridgeway certain rights and powers and agreeing to abide by Ridgeway's terms of service.  Rout Decl. at 32; Tombs Ridgeway Decl. at ¶ 26; Docket No. 29-2.  Woods Hole alleges that the Museum breached the Loan Agreement and also its bailment obligations under Massachusetts law when the Submersible was damaged while under the Museum's control.  Complaint at ¶¶ 147-163.  As such, Woods Hole's claim is based upon the Museum's negotiation and entrance into the contract and its subsequent alleged breach.

The Museum's actions forming the base of this lawsuit are inherently commercial.  They are acts that could be performed by private parties.  Malewicz v. City of Amsterdam, 362 F. Supp. 2d 298, 313 (D.D.C. 2005) (citation omitted) ("[I]f the activity is one in which a private person could engage, it is not entitled to immunity.").  "There is nothing "sovereign" about the act of lending art pieces . . .  Loans between and among museums (both public and private) occur around the world regularly."  Id. at 314.

The Museum argues that its activities were not commercial because the exposition of the Submersible was meant to be a "cultural and educational" exchange and maintains that private individuals could not engage in such activities.  Docket No. 75 at 7.  The Museum's argument, in essence, is that the purpose of the activities in which the Museum engaged was sovereign.

17

However, the relevant inquiry is the nature of those activities, not their purpose.  See Univ.
Trading & Inv. Co., Inc., 727 F.3d at 19 (In determining whether an activity is commercial for
purposes of the FSIA, the Court must "focus not on the purpose of the activity, but rather on the
nature of the course of conduct or particular transaction or act.").  See also NML Capital Ltd. v.
Republic of Argentina, 680 F.3d 254, 260 (2nd Cir. 2012) (finding that a foreign sovereign's
"lack of a profit motive is simply irrelevant.").

In support of its arguments, the Museum relies primarily on Aschenbrenner v. Conseil
Regional de Haute-Normandie, 851 F. Supp. 580 (1994).  Docket No. 51 at 15; Docket No. 75 at
7-8.  Aschenbrenner was decided under a test of commercial activity under which "[t]he court
must inquire whether the activity is of the type an individual would customarily carry on for
profit."  Aschenbrenner, 851 F. Supp. at 584 (citing Morel de Letelier v. Republic of Chile, 748
F.2d 790, 797 (2nd Cir. 1984)).  However, whether the activity is being engaged in for profit is
not relevant to the determination of whether that activity is commercial.  See Weltover, 504 U.S.
at 614 ("[B]ecause the Act provides that the commercial character of an act is to be determined
by reference to its 'nature' rather than its 'purpose,' the question is not whether the foreign
government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign
objectives.").  The Aschenbrenner court harmonized Second Circuit controlling precedent and
the terms of the FSIA by relying on "the distinction between a profit motive and a resemblance
to profit-seeking activities," which that court labeled "abstruse."  Id. at 585.  Thus, the
Aschenbrenner decision, which is not controlling on this Court, is unpersuasive.[11]

---

[11] The Museum also cites to Williams v. Nat'l Gallery of Art, London, No. 16-cv-6978, 2017
WL 4221084 (S.D.N.Y. Sept. 21, 2017), which the Museum describes as finding that a loan of a
painting to a museum in the United States was not sufficient to invoke the commercial activity
exception to the FSIA.  Docket No. 51 at 14.  Williams is inapposite.  The Williams court did not
hold that the loan was not a commercial activity.  Rather, that court found that the lawsuit was

In order for the commercial exception to apply, it is not sufficient to find that the Museum's activities forming the basis of the lawsuit are commercial in nature.  This Court must also find the necessary nexus to the United States.  <u>Univ. Trading & Inv. Co., Inc.</u>, 727 F.3d at 25.  A nexus between a defendant's commercial activity and the United States may be shown under one of three circumstances:

> (1) the activity was "carried on in the United States"; (2) the activity performed in the United States is "in connection with a commercial activity of the foreign state elsewhere"; or (3) the activity occurred "outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."

<u>Id.</u> (citing 28 U.S.C. § 1605(a)(2)).  The FSIA further defines "commercial activity carried on in the United States by a foreign state" as meaning "commercial activity carried on by such state and having substantial contact with the United States."  28 U.S.C. § 1603(e).  Woods Hole appears to be relying upon the first and third of these categories.

Having characterized the commercial activity at issue as the Museum's contracting to borrow the Submersible from Woods Hole, the Court must look at the facts alleged pertaining to the Loan Agreement and the transportation of the Submersible.  <u>See Univ. Trading & Inv. Co., Inc.</u>, 727 F.3d at 25.  Beginning in September 2013, the Museum contacted Woods Hole in Massachusetts with a request to borrow the Submersible.  Land Decl. at ¶ 8; Munier Decl. at ¶ 7; Tarantino Decl. at ¶ 7.  Over two years of detailed negotiations between the Museum and Woods Hole followed, including multiple meetings in Massachusetts between the Museum and Woods Hole representatives and Museum personnel coming to Massachusetts to inspect the

---

not based on the loan and, therefore could not form the basis for the application of the commercial exception.  <u>See</u> <u>Williams</u>, 2017 WL 4221084, at *7 (noting that the loan of the painting to the defendant museum was "wholly irrelevant to the core issue in [the] case: do Plaintiffs have superior title to the Painting?").

Submersible.  Land Decl. at ¶ 9, 22, 23; Munier Decl. at ¶ 7-8, 22-23; Tarantino Decl. at ¶¶ 7-8,

22-23.  In addition, there were many emails and phone calls between the Museum's

representatives and Woods Hole's representatives.  Land Decl. at ¶ 9, 18-45; Munier Decl. at ¶¶

8, 16-45; Tarantino Decl. at ¶¶ 8, 16-45.  While the Museum executed the Loan Agreement in

Australia, it mailed a copy of it to Woods Hole in Massachusetts and sent a letter requesting that

Woods Hole sign the Loan Agreement and return a signed copy to the Museum.  Land Decl. at ¶

46; Munier Decl. at ¶ 45; Tarantino Decl. at ¶ 45.

In addition, the Loan Agreement provided that the Museum would be responsible for the

safe "collection" and "return" of the Submersible to and from Massachusetts.  Docket No. 63-4

at 3-4.  The Museum engaged Ridgeway in New York to arrange for transport of the

Submersible from Massachusetts to Baltimore, Maryland and to obtain insurance for the trip.

Tombs Ridgeway Decl. at ¶ 24.  The Museum signed in Australia a power of attorney to allow

Ridgeway to act on its behalf.  Id. at ¶ 26.  Therefore, the Court finds that Woods Hole has met

its burden to provide evidence showing that the Museum's commercial activities were carried on

in the United States.  See, e.g., Univ. Trading & Inv. Co., Inc., 727 F.3d at 25-26 (finding a

sufficient nexus with the United States where negotiations were alleged to have occurred in the

United States, all contractual instruments were directed to U.S. addresses and those instruments

were allegedly delivered in the United States to a corporation organized under the laws of

Massachusetts with its principal place of business in Massachusetts).

The Museum has set forth no additional facts regarding Woods Hole's allegations with

respect to nexus.[12]  Instead, it argues that the facts highlighted by Woods Hole do not satisfy the

---

[12] The Museum argues that the allegations against it are factually wrong and, therefore, the Court
can reject Woods Hole's arguments that any of the exceptions to the FSIA apply.  While it is true
that the Court should resolve factual disputes regarding the applicability of FSIA exceptions, see

necessary nexus.  Docket No. 75 at 8-9.  Accordingly, this Court finds that the Museum has

failed to meet its burden of persuasion that the commercial activity exception does not apply

here.

      3.    <u>Waiver Exception</u>

Under the FSIA, a foreign sovereign is not immune from the jurisdiction of the United

States in any case "in which the foreign state has waived its immunity either explicitly or by

implication. . ."  28 U.S.C. § 1605(a)(1).  Woods Hole also argues that the Museum also

implicitly waived sovereign immunity pursuant to this exception.  Docket No. 63 at 12-13.

"[F]ederal courts have been virtually unanimous in holding that the implied waiver

provision of Section 1605(a)(1) must be construed narrowly."  <u>Univ. Trading & Inv. Co., Inc.</u>,

898 F. Supp. 2d at 311 (quoting <u>Shapiro v. Republic of Bolivia</u>, 930 F.2d 1013, 1017 (2nd Cir.

1991)).  Courts have found implied waiver in three situations: (1) where a foreign state has filed

a responsive pleading without raising the defense of sovereign immunity; (2) where the foreign

state has agreed to arbitrate in another country; and (3) where the foreign state has agreed that

the law of another country should govern the contract.  <u>Id.</u>  "[C]ourts have been reluctant to stray

beyond these examples when considering claims that a nation has implicitly waived its defense

of sovereign immunity."  <u>Id.</u> (citation omitted).

Here, the Museum agreed that the laws of Massachusetts would govern the Loan

Agreement.  Docket No. 63-4 at 23.  "Where a foreign sovereign consents to subject its

---

<u>Bolivarian Republic of Venezuela</u>, 137 S.Ct. at 1317, the factual allegations that the Museum
contends are wrong concern the merits of the underlying claims, not the jurisdictional issues.
<u>See</u> Docket No. 51 at 19.  For example, the Museum has provided no evidence to dispute that its
representatives traveled to the United States to negotiate the Loan Agreement and to inspect the
Submersible or that the Loan Agreement provided that the Museum would be responsible for
arranging for the collection and return of the Submersible.  Rather, the Museum disputes facts
regarding whether it breached the terms of the Loan Agreement.  <u>See</u> <u>id.</u>

contractual dealings to U.S. law, it 'voluntarily assume[s] obligations under [that] law.'" Ashraf-Hassan v. Embassy of France in the United States, 40 F. Supp. 3d 94, 100 (D.D.C. 2014) (citation omitted).  While such obligations "might theoretically be enforced in the foreign country's own courts . . . [U.S. courts] are clearly best able to interpret and apply the laws of this country." Id.  Thus, courts have found an implied waiver of sovereign immunity, where, as here, the defendant has agreed that the laws of the United States apply to the parties' contractual disputes.  See, e.g., id. at 100-101.  Accordingly, this Court also finds that the implied waiver exception to the FSIA applies to this case.

       4.    Personal Jurisdiction

       The Museum argues that it is not subject to personal jurisdiction in this Court.  Docket No. 51 at 20-25.  Under the FSIA, federal courts are empowered to exercise personal jurisdiction over a foreign sovereign when two conditions are met: (1) an exception from jurisdictional immunity established by the FSIA applies, and (2) the sovereign has been served with process in accordance with the FSIA's provisions.[13] Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela, 863 F.3d 96, 104 (2nd Cir. 2017) (citations omitted).  Thus, courts have sometimes stated that "subject-matter jurisdiction together with proper service of process gives the court personal jurisdiction." See, e.g., Rein v. Socialist People's Libyan Arab Jamahiriya, 995 F. Supp. 325, 330 (E.D.N.Y. 1998).  However, courts have recognized that the exercise of personal jurisdiction might also have to meet constitutional due process requirements.  See Parex Bank v. Russian Sav. Bank, 116 F. Supp. 2d 415, 422 (S.D.N.Y. 2000) (citing Hanil Bank v. PT. Bank Negara Indonesia (Persero), 148 F.3d 127, 134 (2nd Cir. 1998)).

---

[13] The Museum does not dispute that it has been served with process in accordance with the FSIA's provisions.

In order to exercise personal jurisdiction over a foreign state, there must be sufficient "minimum contacts" between the foreign state and the forum "such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Shapiro v. Republic of Bolivia, 930 F.2d 1013, 1020 (2nd Cir. 1991) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). The "substantial contact" standard for subject matter jurisdiction under the commercial activity exception to the FSIA requires a closer nexus than the "minimum contacts" necessary for due process. Id.; Zedan v. Kingdom of Saudi Arabia, 849 F.2d 1511, 1513 (D.C. Cir. 1988). Thus, for the same reasons this Court found subject-matter jurisdiction, it finds that the connections between the Museum and Massachusetts are constitutionally sufficient to support a finding of personal jurisdiction. In addition, this Court does not find unusual inconvenience to the Museum in litigating this matter in the United States. Accordingly, this Court finds that exercising personal jurisdiction over the Museum does not offend due process.

B.    Ridgeway And Guy Tombs' Motions To
      Dismiss Based On Lack of Personal Jurisdiction

Ridgeway and Guy Tombs' challenge the exercise of personal jurisdiction over them. Docket No. 30 at 8-12; Docket No. 33 at 4-12. This Court finds that it has personal jurisdiction over Ridgeway but not Guy Tombs.

1.    Standard Of Review

Woods Hole bears the burden to establish that personal jurisdiction exists over the defendants. A Corp. v. All Am. Plumbing, Inc., 812 F.3d 54, 58 (1st Cir. 2016) (citation omitted). Where, as here, a court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, the "prima facie" standard governs its determination. United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 618 (1st Cir. 2001). Under this standard, "the inquiry is whether [Woods Hole] has proffered evidence which, if credited, is sufficient to

support findings of all facts essential to personal jurisdiction." A Corp., 812 F.3d at 58.  To make a prima facie showing of personal jurisdiction, Woods Hole may not rely on unsupported allegations in his pleadings, but is obliged to put forward evidence of specific facts.  Id. (citations omitted); see also Foster-Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d 138, 145 (1st Cir. 1995) (citation omitted).

In reviewing the facts, the Court must accept Woods Hole's properly documented evidentiary proffers as true and construe them in the light most favorable to its jurisdictional claim.  A Corp., 812 F.3d at 58 (citations omitted).  The Court may also consider facts offered by the defendants to the extent that they are uncontradicted.  Id.

When, as here, the district court's subject-matter jurisdiction rests wholly or in part on the existence of a federal question,[14] "the constitutional limits of the court's personal jurisdiction are fixed in the first instance, not by the Fourteenth Amendment but by the Due Process Clause of the Fifth Amendment."  United Elec., Radio and Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1085 (1st Cir. 1992).  In such circumstances, the Fifth Amendment requires only that the defendant have "minimum contacts" with the United States, rather than with the particular forum state (as would be required in a diversity case).  Id.

The inquiry does not end there, however.  "The next step is to determine whether the nationwide scope of personal jurisdiction in a federal question case is limited by Rule 4 of the Federal Rules of Civil Procedure."  Pike v. Clinton Fishpacking, Inc., 143 F. Supp. 2d 162, 166 (D. Mass. 2001).  This is so because, "[b]efore a federal court may exercise personal jurisdiction over a defendant in a federal question case, there must be authorization for service of summons

_____

[14] Woods Hole asserts that the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because it brings claims under the Carmack Amendment, 49 U.S.C. §§ 14706, et seq.  Complaint at ¶ 16.

on the defendant." Id. (citing Omni Capital Int'l, Ltd. v. Rudolf Woff & Co., Ltd., 484 U.S. 97, 104 (1987)); see also Swiss Am. Bank, 274 F.3d at 618 (noting that "the plaintiff must still ground its service of process in a federal statute or civil rule"). "In other words, though personal jurisdiction and service of process are distinguishable, they are inextricably intertwined, since service of process constitutes the vehicle by which the court obtains jurisdiction." United Elec., Radio and Mach. Workers of Am., 960 F.2d at 1085.

Pursuant to Fed. R. Civ. P. 4(k)(1), service of process establishes personal jurisdiction over a defendant 'who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located,' or 'when authorized by federal statute.'" Medici v. Lifespan Corp., 239 F. Supp. 3d 355, 367 (D. Mass. 2017). Accordingly, this Court can only exercise jurisdiction over the defendants if they would be subject to the jurisdiction of Massachusetts courts or if the federal statute conferring subject matter jurisdiction provides for nationwide service of process. Here, there is no federal statute permitting worldwide or nationwide service of process. Accordingly, the Court's analysis must focus on the defendants' contacts with Massachusetts.

2.    Specific Jurisdiction

In this case, Woods Hole argues that Ridgeway and Guy Tombs can be brought before a Massachusetts court on a theory of specific jurisdiction. Docket No. 44 at 9-16. "Specific jurisdiction exists when there is a demonstrable nexus between a plaintiff's claims and a defendant's forum-based activities." Hannon v. Beard, 524 F.3d 275, 279 (1st Cir. 2008) (citing Mass. Sch. of Law and Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998)).

To exercise specific personal jurisdiction, the Court must find "that the Massachusetts long-arm statute grants jurisdiction and, if it does, that the exercise of jurisdiction under the

statute is consistent with the constitution." Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 52 (1st Cir. 2002).  In the past, the First Circuit had treated the limits of the Massachusetts' long-arm statute as coextensive with those of the Due Process Clause.  See Copia Commc'ns, LLC v. AMResorts, L.P., 812 F.3d 1, 4 (1st Cir. 2016) (citing Daynard, 290 F.3d at 52).  More recently, however, the First Circuit has suggested that the Massachusetts' long-arm statute might impose more restrictive limits on the exercise of personal jurisdiction than does the Constitution.  Id.  The Massachusetts Supreme Judicial Court resolved this tension last year, holding that the long-arm statute's reach is not co-extensive with what due process allows.  SCVNGR, Inc. v. Punchh, Inc., 478 Mass. 324, 329-330 (2017).  Moreover, "[b]ecause the long-arm statute imposes specific constraints on the exercise of personal jurisdiction that are not coextensive with the parameters of due process, and in order to avoid unnecessary consideration of constitutional questions, a determination under the long-arm statute is to precede consideration of the constitutional question."  Id. at 325.  Thus, the Court must first consider whether Massachusetts long-arm statute grants jurisdiction.

      a.     The Massachusetts Long-Arm Statute

"The Massachusetts long-arm statute enumerates eight specific grounds on which a nonresident defendant may be subjected to personal jurisdiction by a court of the Commonwealth."  SCVNGR, Inc., 478 Mass. at 328 (citing M.G.L. c. 223A, §3).  In its opposition, Woods Hole did not address the Massachusetts long-arm statute, relying on older caselaw suggesting that the long-arm statute allows for the assertion of jurisdiction over a defendant to the limits allowed by the U.S. Constitution.  Docket No. 44 at 10, n. 2.  As stated above, however, the SJC has since held that the Massachusetts long-arm statute imposes more restrictive limits on the exercise of personal jurisdiction than the Constitution.  SCVNGR, Inc.,

478 Mass. at 329-330.  Accordingly, Woods Hole must show that the Massachusetts long-arm statute grants jurisdiction.

At oral argument, Woods Hole asserted that subsection 3(a) of the Massachusetts long-arm statute provides for jurisdiction over the defendants.  Section 3(a) provides that:

> A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's . . .
>
> (a)  transacting any business in this commonwealth;

M.G.L. c. 223A, § 3(a).  "The 'transacting business' test under section 3(a) is designed to identify deliberate, as distinguished from fortuitous, contacts with the forum by the nonresident party, see, e.g., Good Hope Indus., Inc. v. Ryder Scott Co., 378 Mass. 1, 10 (1979), with a view to determining whether "'the possible need to invoke the benefits and protections of the forum's laws was reasonably foreseeable . . .'" Lyle Richards Int'l, Ltd. v. Ashworth, Inc., 132 F.3d 111, 112-13 (1st Cir. 1997) (alteration in original) (quoting Good Hope Indus., 389 N.E.2d at 82)). "For jurisdiction to exist under § 3(a), the facts must satisfy two requirements—the defendant must have transacted business in Massachusetts, and the plaintiff's claim must have arisen from the transaction of business by the defendant." Tatro v. Manor Care, Inc., 416 Mass. 763, 767 (citation omitted).

The "transacting any business" language is regularly construed in a generous manner. United Elec., Radio and Mach. Workers of America, 960 F.2d at 1087 (citations omitted). "The test focuses ... upon whether the defendant attempted to participate in the commonwealth's economic life." Id. (citations omitted).  The "arising from" language is also to be generously construed in favor of asserting personal jurisdiction. Lyle Richards, 132 F.3d at 114. "In deciding whether a claim 'aris[es] from' a defendant's 'transacting business,' ... [the court]

look[s] to see whether the transacted business was a 'but for' cause of the harm alleged in the claim." Cossart v. United Excel Corp., 804 F.3d 13, 18 (1st Cir. 2015) (citing Tatro, 625 N.E.2d at 551).  Under the "but-for" test, the inquiry is whether the defendant's contacts with the Commonwealth constitute the "first step in a train of events" that results in injury to the plaintiff. Tatro, 416 Mass. at 770.

This Court finds that Ridgeway transacted business in Massachusetts when it arranged for transportation of freight that it knew originated in Massachusetts and it arranged for that freight to be loaded in Massachusetts and then transported by truck from Massachusetts.  Woods Hole's claims also arise out of Ridgeway's transacting business in Massachusetts.  Woods Hole alleges that the Submersible was damaged while in the possession of Ridgeway, its agents, servants, and contractors.  Complaint at ¶ 99.  Therefore, Woods Hole's claims arise out of Ridgeway's arrangement of transportation for the Submersible from Massachusetts to Baltimore.

There is no evidence before the Court, however, that Guy Tombs transacted any business in Massachusetts.  Guy Tombs' involvement was limited to arranging for insurance for the Submersible.  As noted below, it had no contacts with Massachusetts in doing so.  Despite the fact that Woods Hole did not so argue, this Court will assume, without deciding, that Guy Tombs would be subject to Section 3(f) of the Massachusetts long-arm statute, which provides for jurisdiction over any person arising from the person's "contracting to insure any person, property or risk located within this commonwealth at the time of contracting."  M.G.L. c. 223A, § 3(f). Even if subsection 3(f) provides for jurisdiction over Guy Tombs, as discussed below, this Court finds that the exercise of jurisdiction over Guy Tombs does not comport with constitutional requirements.

b.     Due Process

The Due Process Clause requires a defendant to "have certain minimum contacts with [a forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co., 326 U.S. at 316 (internal quotation marks and citations omitted). "[T]he constitutional analysis has three distinct prongs: relatedness, purposeful availment, and reasonableness." A Corp., 812 F.3d at 59 (citing Phillips v. Prairie Eye Ctr., 530 F.3d 22, 27 (1st Cir. 2008)). As such, the Court must consider:

> (1) whether the claim directly arises out of, or relates to, the defendant's forum activities; (2) whether the defendant's in-state contacts represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable; and (3) whether the exercise of jurisdiction is reasonable.

Id. (quoting C.W. Downer & Co. v. Bioriginal Food & Sci. Corp., 771 F.3d 59, 65 (1s Cir. 2014) (internal quotation marks and modifications omitted)). To succeed, Woods Hole must show that all three prongs are met. Id.

i.     Corporate Separateness

As a preliminary matter, Woods Hole argues that the acts of Ridgeway may be imputed to Guy Tombs for the purposes of determining personal jurisdiction. Docket No. 44 at 10-11. Woods Hole is correct that an agent's or joint venturer's contacts with the forum may be attributed to the principal for purposes of personal jurisdiction. Daynard, 290 F.3d at 55-56. However, Woods Hole has pointed to no evidence to show an agency or joint venture relationship between Ridgeway and Guy Tombs. Rather, Woods Hole merely states that Ridgeway and Guy Tombs are "associated and/or affiliated company[ies];" and that Mr. Guy Tombs owns 100% and 65% of the shares of Guy Tombs and Ridgeway and serves as Ridgeway's president. Docket No. 44 at 10-11.

29

There is a presumption of corporate separateness when determining personal jurisdiction. United Elec., Radio and Mach. Workers of Am., 960 F.2d at 1091.  Such presumption may be overcome by "clear evidence" that the parent in fact controls the activities of the subsidiary.  Id. (citations omitted).  In the First Circuit, that involves a clear showing that the corporations are alter-egos and that the corporate veil should be pierced.  See Medici, 239 F. Supp. 3d at 371-372.

The standard for piercing the corporate veil "is a demanding one."  Id. (citation omitted). "Corporations are presumed to be 'separate and distinct entities' notwithstanding relationships between them."  Id. (citation omitted).  The corporate form may be disregarded if: (1) there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the inter-corporate relationship; or (2) there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting.  Id. (citations omitted).

There is nothing in the record before this Court that would warrant piercing the corporate veil and disregarding the legal independence of Ridgeway and Guy Tombs.  Accordingly, this Court will not impute one's contacts to the other.

Guy Tombs' involvement in this case is limited to arranging insurance for and on behalf of the Museum to cover the Submersible during transport.[15]  Tombs GT Decl. at ¶ 22.  Guy

---

[15] Woods Hole alleges in the complaint that the Museum "retained [Guy Tombs] to provide oversight, management, representation, and logistics with regard to the movement of cargo, and to act as broker, freight forwarder, and carrier."  Complaint at ¶ 29.  However, Woods Hole has put forth no evidence to support that allegation.  See A Corp. v. All Am. Plumbing, Inc., 812

Tombs did not have any contacts with Massachusetts in doing so.  It was contacted by Ridgeway in New York and it, in turn, contacted Fort Insurance in Montreal, which arranged for the policy. Id. at ¶ 22, 23.  Guy Tombs was not involved in planning nor did it participate in any aspect of the transport or loading of the Submersible.  Id. at ¶¶ 27, 29, 30.  Accordingly, Guy Tombs did not have contacts with Massachusetts sufficient to satisfy due process and the Court lacks personal jurisdiction over it.

Ridgeway, on the other hand, had a single contact with Massachusetts: arranging for the transport of the Submersible from Woods Hole, Massachusetts to Baltimore, Maryland. Complaint at ¶ 31, 33.  Ridgeway did so for and on behalf of the Museum.  Guy Tombs Ridgeway Decl. at ¶¶ 24, 26.  Ridgeway in turn arranged with ATS for the carriage of the Submersible from Massachusetts to Maryland.  Id. at ¶ 28.  Personal jurisdiction, however, may be properly based on a single transaction if that transaction gives rise to a cause of action. Brandi v. Belger Cartage Serv., Inc., 842 F. Supp. 1337, 1341 (D. Kan. 1994) (citation omitted). Therefore, the Court turns to whether this contact satisfies the relatedness, purposeful availment and reasonableness requirements.

    ii.    Relatedness

The relatedness element endeavors to focus "the court's attention on the nexus between a plaintiff's claim and the defendant's contacts with the forum."  Sawtelle v. Farrell, 70 F.3d 1381, 1389 (1st Cir. 1995).  "[A] defendant's general connections with the forum are not enough." Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cnty., 137 S. Ct. 1773, 1781 (2017).  Rather, the plaintiff's claims must arise out of, or relate to, the defendant's forum

---

F.3d at 58 (in making prima facie case for personal jurisdiction, plaintiff may not rely on unsupported allegations in its pleadings, but is obliged to put forward evidence of specific facts).

state activities.  Cossart, 804 F.3d at 20.  If there is no connection between the defendant's

contacts and the plaintiff's claim, "specific jurisdiction is lacking regardless of the extent of a

defendant's unconnected activities in the State."  Bristol-Myers, 137 S.Ct. at 1781.  The

relatedness requirement "ensures that the defendant will not be subject to personal jurisdiction

unless its contacts with the forum state caused the alleged harm."  Photographic Illustrators Corp.

v. A.W. Graham Lumber, LLC, 196 F. Supp. 3d 123, 129 (D. Mass. 2016) (quoting Edvisors

Network, Inc. v. Educ. Advisors, Inc., 755 F. Supp. 2d 272, 280 (D. Mass. 2010)).

Woods Hole brings Carmack Amendment, breach of bailment obligations and

negligence claims against Ridgeway.  Complaint at ¶¶ 95-114.  It alleges that the Submersible

was damaged while in the possession of Ridgeway, its agents, servants, and contractors.  Id. at ¶

99.  Ridgeway's agreement to arrange for transport of the Submersible is sufficiently related to

those causes of action.  Accordingly, the relatedness requirement has been met.

 iii. Purposeful Availment

The purposeful availment prong considers whether the defendant has engaged in

voluntary forum activity that made it foreseeable to the defendant that it could be brought to

Massachusetts.  Copia Commc'ns, 812 F.3d at 5.  "The function of the purposeful availment

requirement is to assure that personal jurisdiction is not premised solely upon a defendant's

'random, isolated, or fortuitous' contacts with the forum state."  Sawtelle, 70 F.3d at 1391

(quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774 (1984)).  Voluntariness exists

when a defendant reaches out to the plaintiff's state of residence to create a relationship.  Phillips

Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 292 (1st Cir. 1999).  Even where a

court finds voluntariness, "the purposeful availment prong of the jurisdictional test investigates

whether the defendant benefitted from those contacts in a way that made jurisdiction

foreseeable." Id. "The focus of the purposeful availment inquiry is the defendant's intentionality." Adams v. Adams, 601 F.3d 1, 6 (1st Cir. 2010).

While Ridgeway has no employees, offices or property in Massachusetts, does not advertise in Massachusetts, and did not initiate the contract in question, its contacts with Massachusetts concerning the transport of the Submersible are sufficient to satisfy the purposeful availment requirement. Whether Ridgeway is properly characterized as a transportation broker, carrier, or freight forwarder, it is clear that it is in the business of arranging for the interstate transportation of cargo and that it did so in this case. Tombs Ridgeway Decl. at ¶¶ 5, 24, 28. Ridgeway did not, as it suggests, merely place a product in the stream of commerce that happened to end up in Massachusetts. Rather, it arranged for transportation of freight that it knew originated in Massachusetts and it arranged for that freight to be loaded in Massachusetts and then transported by truck from Massachusetts. Id. at ¶ 28. Therefore, Ridgeway should have foreseen the possibility of litigation arising in Massachusetts. See, e.g., Electroplated Metal Solutions, Inc. v. Am. Servs., Inc., No. 07 C 409, 2008 WL 345617, at *4 (N.D. Ill. Feb. 7, 2008) (finding personal jurisdiction in Illinois where transportation broker was arranging for transportation to an Illinois location); Brandi, 842 F. Supp. at 1341-1342 (finding the purposeful availment requirement satisfied where transportation broker arranged for the transport of goods through the forum state). Such contacts are sufficient given the unique nature of the transportation brokering business. "To require more would 'tend to immunize from suit . . . in any but their home jurisdiction, those engaged in nationwide commercial activity in other jurisdictions primarily by telephone or through the mails." Electroplated Metal Solutions, Inc., 2008 WL 345617, at *4 (citation omitted). Accordingly, this Court finds that the purposeful availment requirement has been met with respect to Ridgeway.

iv.     Reasonableness

To determine whether the exercise of personal jurisdiction would be reasonable, courts consider the following "gestalt" factors:

> (1) the defendant's burden of appearing [in the forum], (2) the [forum's] interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

Plixer Int'l, Inc. v. Scrutinizer GmbH, 905 F.3d 1, 12 (1st Cir. 2018) (quoting Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 209 (1st Cir. 1994)).

These factors "are not ends in themselves, but they are, collectively, a means of assisting courts in achieving substantial justice." Photographic Illustrators Corp., 196 F. Supp. 3d at 131 (quoting Pritzker v. Yari, 42 F.3d 53, 64 (1st Cir. 1994)). "The reasonableness consideration is one that, at its core, considers 'fundamental fairness.'" Id. (citing Ticketmaster, 26 F.3d at 212).

The gestalt factors "play a larger role in cases where the minimum contacts question is very close." Adelson v. Hananel, 510 F.3d 43, 51 (1st Cir. 2007). "A distant court cannot constitutionally exercise *in personam* jurisdiction over a nonresident defendant at the behest of a plaintiff who can muster only the most tenuous showing of relatedness and purposefulness if . . . forcing the defendant to defend in the forum would be plainly unreasonable." Ticketmaster, 26 F.3d at 210. Furthermore, "in certain circumstances, unreasonableness can trump a minimally sufficient showing of relatedness and purposefulness." Id.

An out-of-state defendant's burden of defending itself in a forum other than its home is usually afforded little weight. See, e.g., Ace Am. Ins. Co. v. Oyster Harbors Marine, Inc., 310 F. Supp. 3d 295, 309 (D. Mass. 2018). "[T]his factor is only meaningful where a party can demonstrate some kind of special or unusual burden." Pritzker, 42 F.3d at 64. Ridgeway does

not assert any special burden it would encounter having to litigate in Massachusetts, nor does the record reveal a greater burden on Ridgeway appearing in Massachusetts than Woods Hole appearing in New York.

The second factor, concerning the forum's state interest in adjudicating the dispute, weighs slightly in favor of Woods Hole.  "[T]he purpose of this inquiry is not to compare the forum's interest to that of some other jurisdiction, but to determine the extent to which the forum has an interest." Sawtelle, 70 F.3d at 1395.  Massachusetts has an interest in protecting its own non-profit corporations and affording them a convenient forum in which to bring their claims.

The third factor also favors Woods Hole.  The First Circuit "has repeatedly observed that a plaintiff's choice of forum must be accorded a degree of deference with respect to the issue of its own convenience." Id. (citations omitted).  It would be more convenient for Woods Hole to litigate its claims in its home state.

The fourth gestalt factor, which examines the judicial system's interest in obtaining the most effective resolution of the case is "generally considered a 'wash.'" Katz v. Spiniello Cos., 244 F. Supp. 3d 237, 249 (D. Mass. 2017).  Finally, the fifth factor, which considers the interest of all sovereigns in promoting substantive social policies, implicates the ability of Massachusetts courts to provide a convenient forum for its residents to redress injuries inflicted by out-of-state actors.

Accordingly, this Court finds that the exercise of jurisdiction over Ridgeway would be reasonable.

C.      Motion To Dismiss For Failure To Join Indispensable Parties

Ridgeway and Guy Tombs have also moved to dismiss the Complaint for failure to join indispensable parties.  Docket No. 30 at 15-16; Docket No. 33 at 17-18.  Whether an action

should be dismissed for failure to join an indispensable party is governed by Rule 19 of the

Federal Rules of Civil Procedure.  See United States v. San Juan Bay Marina, 239 F.3d 400, 405

(1st Cir. 2001).  Rule 19 contemplates a two-step inquiry.  The first step is to determine whether

a party is "necessary" to the action, in the sense that such party should be joined if feasible.  Fed.

R. Civ. P. 19(a); San Juan Bay Marina, 239 F.3d at 405.  A party is "necessary" if

> (A) in that person's absence, the court cannot accord complete relief among
> existing parties; or
> (B) that person claims an interest relating to the subject of the action and is
> so situated that disposing of the action in the person's absence may:
>   (i) as a practical matter impair or impede the person's ability to protect the
> interest; or
>   (ii) leave an existing party subject to a substantial risk of incurring double,
> multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1).

If the person is a "necessary" party (i.e., fits the definition of 19(a)), but joinder is not

feasible, the court must then decide whether the litigation may continue in the absence of such

person or whether he or she is so indispensable that the court should dismiss the case for lack of

jurisdiction.  Picciotto v. Continental Cas. Co., 512 F.3d 9, 17 (1st Cir. 2008) (citation omitted).

Rule 19(b) states that the factors to be considered for this second step are:

> (1) the extent to which a judgment rendered in the person's absence might
> prejudice that person or the existing parties;
> (2) the extent to which any prejudice could be lessened or avoided by:
>     (A) protective provisions in the judgment;
>     (B) shaping the relief; or
>     (C) other measures;
> (3) whether a judgment rendered in the person's absence would be adequate;
> and
> (4) whether the plaintiff would have an adequate remedy if the action were
> dismissed for nonjoinder.

Fed. R. Civ. P. 19(b).

Ridgeway and Guy Tombs list a number of parties they maintain are necessary to this action but provide no analysis to support that assertion.  Docket No. 30 at 15-16; Docket No. 33 at 17-18.  They also provide no analysis regarding whether those parties may be joined in this litigation and, if not, whether they are indispensable.  See Docket No. 30 at 16; Docket No. 33 at 18 (stating only that "to the extent that any of the above parties cannot be joined to this litigation, the complaint should be dismissed.").  As such, the Court deems this argument waived.  See Redondo-Borges v. United States Dep't of Housing and Urban Dev., 421 F.3d 1, 6 (1st Cir. 2005) (citation omitted) ("Few principles are more sacrosanct in this circuit than the principle that 'issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'").

D.    Motion To Dismiss For Failure To State A Claim

ATS, Ridgeway, and Guy Tombs have argued that some or all of the claims against them must be dismissed for failure to state a claim.  Docket No. 20 at 6-15; Docket No. 30 at 12-14; Docket No. 33 at 13-17.

1.    Standard Of Review

A complaint must contain only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."

Id.

In assessing the sufficiency of the complaint, "an inquiring court must first separate wheat from chaff; that is, the court must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." Guadalupe-Baez v. Pesquera, 819 F.3d 509, 514 (1st Cir. 2016) (citing Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)).  The Court must then determine "whether the well-pleaded facts, taken in their entirety, permit 'the reasonable inference that the defendant is liable for the misconduct alleged.'"  Id. (citations omitted).

   2.   Carmack Amendment Preemption

The Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706 (the "Carmack Amendment") governs the liability of carriers for lost or damaged goods.  Rini v. United Van Lines, Inc., 104 F.3d 502, 503 (1st Cir. 1997).  "The purpose of [the Carmack Amendment] is to establish uniform federal guidelines designed in part to remove the uncertainty surrounding a carrier's liability when damage occurs to a shipper's interstate shipment."  Id. at 507 (citations omitted).

The Carmack Amendment generally preempts state common law or statutory causes of action premised upon the liability of an interstate motor carrier for damages or loss to goods being transported in interstate commerce.  Sokhos v. Mayflower Transit, Inc., 691 F. Supp. 1578, 1581 (D. Mass. 1988).  ATS and Wright maintain that the Carmack Amendment does not apply to this case.  Docket No. 21 at 6, n. 1; Docket No. 23 at 3, n. 1.  Rather, the Carriage of Goods by Sea Act ("COGSA") applies.  Id.  However, they state that they have filed their motion to dismiss based on the allegations in the complaint, including Woods Hole's Carmack Amendment

38

claims.  Id.  Therefore, they seek dismissal of Woods Hole's state law causes of action based on Carmack Amendment preemption.  Id.

For its part, Woods Hole maintains that the Carmack Amendment does apply to this case. Docket No. 42 at 4, 8-10.  It also acknowledges that, if the Carmack Amendment applies, some of its state law causes of action are preempted.  Id. at 4.  However, it explains that it has pled those state law causes of action in the alternative should the Court ultimately find that the Carmack Amendment does not apply to this case.  Id. at 4, 10-11.

At this stage, Woods Hole is permitted to plead alternative and even inconsistent legal theories, even if it only can recover under one of those theories.  See Lass v. Bank of Am., 695 F.3d 129, 140 (1st Cir. 2012); see also Fed. R. Civ. P. 8(d).  Accordingly, the Court declines to recommend dismissal of the state law causes of action based on Carmack Amendment preemption.

      3.    ICCTA/FAAAA Preemption

ATS also argues that Woods Hole's claim for unfair and deceptive practices (Count IV) is preempted by the Interstate Commerce Commission Termination Act ("ICCTA") or the Federal Aviation Administration Authorization Act ("FAAAA").  Docket No. 21 at 12-15. Woods Hole has not addressed this argument in its opposition.  Accordingly, this Court recommends that the District Judge dismiss Count IV on this basis.

      4.    Claims Against Ridgeway

Ridgeway moves to dismiss Woods Hole's breach of bailment obligations (Count VI) and negligence (Count VII) claims against it.  Docket No. 30 at 12-14.

First, Ridgeway argues that Woods Hole has failed to allege any facts to show that a bailment was created.  Id. at 14.  A bailment "arises only upon delivery of possession of the

property sought to be bailed, and at least some degree of control over that property, to the

putative bailee." Sewall v. Fitz-Inn Auto Parks, Inc., 3 Mass. App. Ct. 380, 382 (1975) (citations

omitted).  Here, Woods Hole alleges that Ridgeway agreed to transport the Submersible from

Woods Hole, Massachusetts to Baltimore, Maryland and to do so in like good order and

condition.  Complaint at ¶ 31.  Woods Hole further alleges that Ridgeway engaged ATS to

prepare and transport the Submersible.  Id. at ¶ 33.  In addition, Woods Hole alleges that ATS

took possession of the Submersible "under the direction, supervision, and control" of Ridgeway.

Id. at ¶ 37.  Woods Hole has not alleged that Ridgeway ever took possession of the Submersible.

Accordingly, this Court finds that Woods Hole has failed to state a claim for breach of bailment

obligations against Ridgeway.

Second, Ridgeway argues that Woods Hole has failed to state a claim for negligence

because it has not alleged any facts to establish that Ridgeway owed it a duty of care.  Docket

No. 30 at 14.  While Woods Hole states, in a conclusory fashion, that Ridgeway had a duty of

care to secure, protect, and timely deliver the Submersible, Complaint at ¶ 110, it has not alleged

any facts supporting that conclusion.  Woods Hole appears to rest its negligence claim on the

existence of a bailment but, as explained above, the Complaint fails to establish the existence of

bailment.  Accordingly, this Court finds that Woods Hole has also failed to state a claim for

negligence against Ridgeway.

5.     Claims Against Guy Tombs[16]

To the extent that Guy Tombs' argues that the facts pled in the Complaint are wrong, see

---

[16] As this Court is recommending dismissal of the claims against Guy Tombs for lack of personal
jurisdiction, it is not necessary to address its motion to dismiss for failure to state a claim.
However, for the sake of completeness, and in the event the District Judge disagrees with its
conclusions, this Court addresses the sufficiency of the complaint with respect to Guy Tombs as
well.

Docket No. 33 at 13-17,[17] its motion raises issues of fact not appropriate for a motion to dismiss.[18]  Twombly, 550 U.S. at 555-556 (at the motion to dismiss stage, the Court must take all well-pleaded allegations in the complaint as true).  However, for the same reasons stated above with respect to Ridgeway, Woods Hole has failed to state a claim for breach of bailment and negligence against Guy Tombs.

III.   RECOMMENDATION

     For the foregoing reasons, this Court recommends that the District Judge assigned to this case deny the Museum's motion to dismiss, grant in part and deny in part ATS's motion to dismiss, grant Wright's motion to dismiss, grant in part and deny in part Ridgeway's motion to dismiss, and grant Guy Tombs' motion to dismiss.  Specifically, this Court recommends that the District Judge dismiss Counts IV, VI, VII, VIII, IX, X, XI, XIV, XV of the Complaint.

IV.   REVIEW BY DISTRICT JUDGE

     The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72(b), any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of service of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed

---

[17] Guy Tombs' states that "WHOI's claims against GT are unfounded and based on a total misapprehension of GT's actual role."  Docket No. 33 at 14.

[18] This Court declines Guy Tombs and Rigdeway's invitation to convert the motion to dismiss to a motion for summary judgment.  See Docket No. 48 at 5-7.  To the extent that the parties have presented matters outside the pleadings, this Court has only considered those matters in connection with the jurisdictional issues.  See Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 675 (1st Cir. 1992) (citations omitted) (In order to sustain burden of proving personal jurisdiction, "plaintiff must go beyond the pleadings and make affirmative proof."); Callahan v. Harvest Board Int'l, Inc., 138 F. Supp. 2d 147, 152-53 (D. Mass. 2001) ("The consideration of materials outside the complaint is appropriate in ruling on a motion to dismiss for lack of personal jurisdiction.").

findings, recommendations, or report to which objection is made, and the basis for such objections.  See Fed. R. Civ. P. 72.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P. 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Phinney v. Wentworth Douglas Hospital, 199 F.3d 1 (1st Cir. 1999); Sunview Condo. Ass'n v. Flexel Int'l, Ltd., 116 F.3d 962 (1st Cir. 1997); Pagano v. Frank, 983 F.2d 343 (1st Cir.1993).

/s/ Jennifer C. Boal                                   
JENNIFER C. BOAL
United States Magistrate Judge