United States District Court
District of Massachusetts

---

|  |  |
|---|---|
| Woods Hole Oceanographic Institution, | ) ) ) |
|  | ) |
|           Plaintiff, | ) |
|  | ) |
|           v. | )   Civil Action No. |
|  | )   17-12301-NMG |
| ATS Specialized, Inc., et al., | ) |
|  | ) |
|           Defendants. | ) |
|  | ) |

---

MEMORANDUM & ORDER

GORTON, J.

This case arises from the substantial damage done to an experimental, deep sea submarine during its transport between Woods Hole, Massachusetts and Australia. It didn't get very far.

In or about May, 2017, plaintiff Woods Hole Oceanographic Institution ("WHOI" or "plaintiff"), the owner of the submarine, executed a settlement agreement with Eagle Underwriting Group, Inc. ("Eagle") and its underwriters (collectively "the insurance companies") whereby the insurance companies agreed to pay WHOI $3.9 million and WHOI agreed to assign (subrogate) any claims arising out of the damage to the insurance companies to the extent of that payment. Thereafter, WHOI brought several claims sounding in contract and tort against the multiple defendants

- 1 -

allegedly involved in the transportation of the submarine and, in January, 2021, this Court named the insurance companies as co-plaintiffs.

Pending before the Court are more than 15 motions for summary judgment and a plethora of other motions filed by the parties.

I.    **Background**

   **A. The Facts**

The facts of this case have been broadly recited in prior Memoranda of this Court and Reports and Recommendation of Magistrate Judge Jennifer C. Boal, <u>see, e.g.</u>, Docket Nos. 91, 238, 239, 420 & 444, but relevant here is the following:

In or before 2015, WHOI and the Australian National Maritime Museum ("the Museum") executed an agreement ("the Loan Agreement") whereby WHOI was to loan its submarine, the Deepsea Challenger ("the DSC"), to the Museum for two years.  The agreement provided that the Museum was responsible for, <u>inter alia</u>, arranging the multimodal transportation of the vessel between Massachusetts and Australia and insuring it during that transport for $5 million, the amount disclosed in the Loan Agreement as the value of the DSC.  The parties also agreed to indemnify each other against all "actions, claims, suits, demands, liabilities, losses, damages and costs" relating to the Loan Agreement.

To perform its obligations under the Loan Agreement, the Museum retained Ridgeway International Australia Limited ("Ridgeway Australia") to arrange the transportation and obtain insurance coverage for the trip.  Ridgeway Australia, in-turn, engaged Ridgeway International USA, Inc. ("Ridgeway USA") to coordinate and supervise both and the Museum subsequently provided Ridgeway USA a power of attorney to perform those duties on the Museum's behalf.  The Museum also received a donation from Wallenius Wilhelmsen Logistics ("Wallenius"), an ocean carrier, to cover the ocean portion of the trip.

With respect to the inland portion of the transport, Ridgeway USA contracted with ATS Specialized ("ATS") to carry the submarine via tractor-trailer ("the Trailer") from Woods Hole, Massachusetts to the port of Baltimore, Maryland, where it was to be loaded onto the Wallenius vessel and shipped to Australia.  Ridgeway USA also arranged for Guy Tombs Ltd. ("GTL") to secure a $5 million cargo insurance policy covering the entire transportation of the DSC.

### i.  The Insurance Policy

Just prior to departure, GTL obtained a $6.5 million Single Shipment Policy ("the Policy") from Eagle's underwriters which represents a $1.5 million increase from the amount requested and from the disclosed value of the DSC as listed in the Loan

Agreement.  The Policy, which is apparently governed by English law, named GTL as an insured, WHOI as the loss payee and the Museum as the consignee of the DSC.  Neither Ridgeway USA nor the Museum were expressly named as insureds under the Policy but the Museum paid the Policy premium and the named insured, i.e. GTL, is an entity owned by the same individual who owns 65% of Ridgeway USA, namely, Mr. Guy Tombs.  Furthermore, the Policy contained an "Insured Clause" providing that

> Eagle Underwriting Group Inc. in consideration of premium at the rate(s) hereinafter stated does insure on behalf of and as Agents for the Company(ies) (hereinafter referred to as the Company) set forth in the Declaration Page and/or affiliated and/or associated and/or subsidiary companies and/or for whom the Insured receives instructions or have a responsibility to arrange insurance.

Thus, Ridgeway USA and the Museum contend that they are covered by the Policy.  They proffer several affidavits and other evidence in support of that position, including affidavits of Robert Smaza ("Smaza"), the Vice-President of an insurance brokerage firm, and Becky Lynn Hodge ("Hodge"), the Director of Ridgeway USA, and an expert report by Peter MacDonald Eggers ("Eggers"), a purported expert in English insurance law.  Plaintiffs disagree and have moved to strike the two affidavits and a supplemental expert report of Eggers.

### ii.   The Transport and Fire

On July 7, 2015, approximately two weeks prior to the shipment, an ATS driver took the subject Trailer to a TravelCenters of America ("TCA") in Whitestown, Indiana, complaining of an air leak.  There, a TCA service technician performed an annual Department of Transportation ("DOT") inspection, repaired the slack adjusters on the Trailer's rear axle and attempted to address the driver's complaint of an air leak.  The service technician examined the Trailer's brakes and other components and, although he failed to identify the air leak, he ultimately verified that each component met the requirements to allow the Trailer to pass the DOT inspection. Accordingly, the Trailer was deemed safe and appropriate for transporting cargo.

On or about July 22, 2015, ATS took possession of the DSC, loaded it onto the Trailer and began the trip to Baltimore. That same day, Ridgeway USA forwarded to ATS and WHOI a Truck Bill of Lading which was to be used for informational purposes only and which provided that the DSC was to be delivered by ATS to Baltimore, Maryland the following day.  The bill of lading contained no terms, conditions or provisions concerning limitation of liability or choice of law.  ATS contends that it also issued its own bill of lading ("the ATS Bill") that day,

although the other parties disagree and submit that the ATS Bill was not produced until several days after the transport.  The ATS Bill notes Baltimore as the destination and purports to limit ATS' liability for any loss or damage to $1.00 per pound of cargo weight.

Approximately one hour into the trip, the Trailer experienced a single tire blow-out in its front axle. Terminated defendant Service Tire Truck Center ("STTC") was called to service the flat tire and sent one of its tire technicians to do the job.  When the tire technician arrived at the Trailer, he removed the front left tires, cleaned and inspected the exterior of the front-axle brake drum for clogs and cracks per usual and affixed the replacement tire.  A few hours later, the Trailer was parked overnight at another TCA facility in Rhode Island.  Just after its departure the next day, however, the left rear wheel well of the Trailer caught fire.  The fire spread to the submarine and caused substantial damage to it.

The parties have designated multiple experts to opine on the origin and cause of the fire.  All parties acknowledge that the fire was caused by some component of the subject Trailer's brake system and many attribute it to a small air leak at or near the left brake chamber of the Trailer's rear axle.  The

experts dispute, however, which specific mechanism ultimately caused the conflagration.

### B. The Procedural History

Following the fire, WHOI made a claim under the Policy and sent a notice of such to Ridgeway USA and ATS. Ridgeway USA responded that it was entitled to the benefit of the Policy but has yet to collect thereunder. On or about May 3, 2017, WHOI entered into a Settlement Agreement and Mutual Release ("the Settlement Agreement") with Eagle and its underwriters whereby the insurance companies agreed to pay WHOI $3.9 million for the damage to the DSC. None of the defendants were included in the settlement discussions nor the ultimate agreement.

Pursuant to the Settlement Agreement, WHOI assigned all subrogated rights to the insurance companies to the extent of the payments made by them. The agreement also acknowledged that WHOI may have losses not covered by the Policy and damages in excess of $3.9 million. It, thus, permitted WHOI to pursue claims for its uninsured losses "as it sees fit".

Two weeks later, Anderson Trucking Service, Inc. ("Anderson"), a company affiliated with ATS, filed a complaint for declaratory judgment in the United States District Court for the District of Connecticut. See Anderson Trucking Servs., Inc. v. Eagle Underwriting Group, Inc., et al., No. 3:17-cv-000817 (D. Conn.). Anderson named WHOI, the Museum, Ridgeway USA and

Eagle as defendants, seeking a declaration that 1) it is not liable for any damage to the DSC or, in the alternative, 2) any liability should be limited.  That case was dismissed without prejudice as to most defendants in August, 2018, for lack of personal jurisdiction and voluntarily dismissed as to the remaining defendants in December, 2020.

In the meantime, in November, 2017, WHOI brought this action on its own behalf and as agent, trustee, assignee and/or subrogee of all other interested parties who were damaged as a result of the loss.  WHOI sued ATS, the Museum, Ridgeway USA, TCA and other defendants for, inter alia, breach of contract, breach of bailment obligations, negligence and liability under the Carmack Amendment, 49 U.S.C. § 14706.  Over the course of nearly four years, multiple answers, counter-claims, cross-claims, third-party claims and motions have also been filed in this case.  Several defendants have been dismissed and, in general, all remaining parties deny liability for the damage and posit numerous affirmative defenses.

In January, 2021, this Court accepted and adopted a Report and Recommendation of Magistrate Judge Boal recommending that this Court join Eagle and the insurance companies as co-plaintiffs in this lawsuit.  The magistrate judge explained that WHOI remains a real party in interest in this case because it alleges uninsured losses beyond the $3.9 million payment made by

the insurance companies but that Eagle and its underwriters are likewise real parties in interest because they have paid at least part of the loss incurred by WHOI and have a right to subrogation.  Also in January, 2021, this Court entered summary judgment in favor of STTC because nothing in the record indicated that the tire change performed by STTC contributed to the fire.

Since then, more than 10 summary judgment motions and several motions to strike have been filed by various parties which have been fully briefed and remain pending.

## II.  **Plaintiffs' Motions to Strike**

As an initial matter, Eagle and its underwriters have moved to strike the affidavits of Smaza and Hodge which have been submitted in support of the summary judgment motions of Ridgeway USA and the Museum.  The plaintiffs contend that this Court should refrain from considering those affidavits on summary judgment because they contain hearsay statements and impermissible expert opinion evidence and the defendants failed to attach to the affidavits certain exhibits cited by the affiants.  Defendants respond that the affidavits are based exclusively on the affiants' personal observations, experience and knowledge and plaintiffs have not been prejudiced by any inadvertent omission of exhibits by defendants because the omitted documents have been filed with other submissions.

This Court agrees with defendants and will, therefore, deny plaintiffs' motions to strike the affidavits of Hodge and Smaza. See Fed. R. Civ. P. 56(e) (permitting courts to consider on summary judgment affidavits that are "made on personal knowledge, [] set forth such facts as would be admissible in evidence, and [] show affirmatively that the affiant is competent to testify to the matters stated therein."); Bennett v. Saint-Gobain Corp., 453 F. Supp. 2d 314, 324 n.22 (D. Mass. 2006) ("[A]ffidavits . . . are generally not admissible at trial but may be considered at the summary judgment stage.").

Turning to the motion of Eagle and its underwriters to strike as untimely the supplemental expert report of Eggers, this Court will also deny that motion.  Defendants gave timely notice of the application of English law, timely disclosed Eggers' initial expert report in August, 2020, and, more than 30 days before trial, supplemented that report in response to criticisms raised by Eagle's counter-motion for summary judgment indicating that the initial report was incomplete. See Fed. R. Civ. P. 26(a)(3)(B); 26(e).  Furthermore, Eagle has identified no specific prejudice that it will suffer if the supplemental report is considered by this Court.

In any event, the supplemental report was submitted to help this Court define the contours of English insurance law and Fed. R. Civ. P. 44.1 permits courts to consider any relevant material

or source in determining foreign law, including expert
testimony. <u>See</u> <u>BCCI Holdings (Luxembourg), Societe Anonyme</u> v.
<u>Khalil</u>, 184 F.R.D. 3, 9 (D.D.C. 1990) (denying defendant's
motion to strike the expert report of plaintiff's English law
expert despite plaintiff's failure to comply with Rule 26
because plaintiff had given notice of English law pursuant to
Rule 44.1).  At this juncture, the Court finds no reason to
impose the onerous sanction of striking Eggers' supplemental
expert report. <u>See</u> <u>Brodbeck</u> v. <u>Massachusetts Dep't of</u>
<u>Corrections</u>, No. 18-cv-10855, 2021 WL 3131601, at *3 (D. Mass.
July 23, 2021) ("Motions to strike are generally disfavored in
practice." (quotations and citations omitted)).

### III. <u>Objection to a Ruling of Magistrate Judge</u>

Also pending before the Court are the objections by
defendant ATS and plaintiffs to a ruling of Magistrate Judge
Boal on TCA's motion to preclude testimony of expert witness
Samuel "Duke" Drinkard.  For the reasons that follow, this Court
will sustain the objection to the extent Magistrate Judge Boal
excluded all of Drinkard's testimony but, otherwise, overrule
the objection and affirm the magistrate judge's ruling.

In March, 2021, TCA moved to preclude the testimony of ATS
expert witnesses Stephen Harris ("Harris") and Sammuel "Duke"
Dinkard ("Drinkard").  Magistrate Judge Boal heard oral argument
on those motions in May, 2021, and, soon thereafter, entered an

order denying the motion to preclude the testimony of Harris but allowing the motion to preclude the testimony of Drinkard. ATS and plaintiffs filed timely objections to that order as to Drinkard in June, 2021.

Drinkard opines that the fire was caused by a leak in the Trailer's push-pull valve which ultimately caused the service brakes on the Trailer's rear axle to drag. In coming to that conclusion, he did not initially inspect the Trailer but, instead, reviewed copies of work orders, deposition testimony, photographs taken during the inspection of the Trailer by other experts and detailed schematics of the air brake system from the Trailer's manual. He was, then, deposed in November, 2020, and TCA issued rebuttal expert reports in December, 2020. Only after TCA filed its motions to preclude his testimony and for summary judgment against WHOI and the Museum did Drinkard conduct a "hands-on" testing of an exemplar Trailer. His "supplemental" expert report of that analysis was disclosed in April, 2021, which Magistrate Judge Boal found to be untimely for failing to qualify as a supplemental disclosure under Fed. R. Civ. P. 26(e). Thereafter, she concluded that Drinkard's initial opinion was unreliable because it was rendered before he inspected the exemplar Trailer. Plaintiffs and ATS object to both conclusions.

If a party timely objects to the non-dispositive rulings of a magistrate judge on pretrial matters, the district judge must modify or set aside any part of the disputed order that is "clearly erroneous or contrary to law." Fed. R. Civ. P. 72(a); 28 U.S.C. § 636(b)(1)(A).  As another session of this Court has found,

> [a] respect for this standard is important, given the pivotal role that magistrate judges play in overseeing the conduct of the sort of complex pretrial discovery typified by this case.

Gargiulo v. Baystate Health Inc., 279 F.R.D. 62, 64 (D. Mass. 2012).

The "clearly erroneous" standard requires the district judge to accept the factual findings and conclusions of the magistrate judge unless, after reviewing the entire record, the district judge has a "strong, unyielding belief that a mistake has been made". Green v. Cosby, 160 F. Supp. 3d 431, 433 (D. Mass. 2016 (citing Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 4 (1st Cir. 1999)).  Meanwhile, under the "contrary to law" requirement, the district judge reviews pure questions of law de novo, see PowerShare, Inc. v. Syntel, Inc., 597 F.3d 10, 15 (1st Cir. 2010), and factual findings for clear error, Phinney, 199 F.3d at 4.  Mixed questions of law and fact invoke a sliding scale of review pursuant to which

> [t]he more fact intensive the question, the more deferential the level of review (though never more

deferential than the clear error standard); the more law intensive the question, the less deferential the level of review.

In re IDC Clambakes, Inc., 727 F.3d 58, 64 (1st Cir. 2013) (internal quotation marks omitted).

Here, the Court agrees with Magistrate Judge Boal that Drinkard's April, 2021, report should be excluded as untimely because it fails to qualify as a supplemental disclosure under Fed. R. Civ. P. 26(e)(1)(A) and, rather, constitutes a new analysis conducted in order to "bolster" his opinion. See In re Zofran (Ondansetron) Products Liability Litig., No. 15-md-2657, 2019 WL 5423907, at *3 (D. Mass. Oct. 23, 2019). Accordingly, the "supplemental" disclosure and reference thereto will be excluded.

As to the magistrate judge's conclusion that Drinkard's expert opinion is insufficiently reliable under Daubert, however, the Court disagrees. In reaching her conclusion, Magistrate Judge Boal cited only the fact that Drinkard neither inspected nor tested the subject Trailer or any of its components. Missing from her analysis, however, is any mention of Drinkard's experience in truck maintenance and operation or the sources and materials Drinkard did review which include work orders, deposition testimony, photographs taken during the inspection of the Trailer by other experts and detailed schematics of the air brake system from the Trailer's manual.

- 14 -

Because the First Circuit Court of Appeals has held that an expert need not actually test a machine to render a reliable opinion about that machine, cf. Quilez-Velar v. Ox Bodies, Inc., 823 F.3d 712, 718-19 (1st Cir. 2016), this Court will reject the ruling of the magistrate judge precluding Dinkard's testimony in its entirety.

In any event, TCA can challenge at trial the reliability of Drinkard's testimony through

> vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof [which] are the traditional and more appropriate means of attacking shaky but admissible evidence.

See Daubert v. Merrell Dow Parm., Inc., 509 U.S. 579, 596 (1993).

### IV. **Motions for Summary Judgment**

#### A. Legal Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)).  The burden is on the moving party to show, through the pleadings, discovery and affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A fact is material if it "might affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." Id.

If the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine, triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The Court must view the entire record in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993).  Summary judgment is appropriate if, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Celotex Corp., 477 U.S. at 322-23.

### B. Application

#### 1. The Value of the Submarine

Three of the remaining defendants have moved, by summary judgment, to preclude WHOI from claiming that the value of the DSC is more than $5 million.  As reason therefor, the defendants contend that, prior to the fire, WHOI repeatedly represented to them and others that the DSC is worth that amount and WHOI

- 16 -

should, therefore, be estopped from now arguing for a higher

value.  This Court agrees.

To succeed on a claim of promissory estoppel under

Massachusetts law, a plaintiff must show that

> (1) a promisor makes a promise which he should reasonably
> expect to induce action or forbearance of a definite and
> substantial character on the part of the promisee, (2) the
> promise does induce such action or forbearance, and
> (3) injustice can be avoided only by enforcement of the
> promise.

Rogatkin ex rel. Rogatkin v. Raleigh Am., Inc., 69 F. Supp. 3d

294, 301 (D. Mass. 2014) (quoting Neuhoff v. Marvin Lumber &

Cedar Co., 370 F.3d 197, 203 (1st Cir. 2004)).  In this case,

the Court finds that injustice can be avoided only by enforcing

WHOI's representation that the DSC is worth $5 million because,

as discussed below, the record shows the Museum, Ridgeway USA

and ATS each relied on that representation and would have taken

additional measures to limit their liability had they known the

DSC was worth more.

### i.  The Museum

With respect to the Museum, WHOI executed a Loan Agreement

with that defendant in which WHOI specifically stated in the

contract that the DSC's value was "$USD5,000,000.00".  WHOI

asked the Museum to obtain cargo insurance for that amount and,

while negotiating the agreement, WHOI did not represent that the

submarine was worth anything other than $5 million. See Rev-Lyn

Contracting Co., 760 F. Supp. 2d at 168 (citing Tidewater Marine
Activities, Inc. v. American Towing Co., 437 F.2d 124 (5th Cir.
1970) (accepting a valuation of a vessel, in part, because it
was "corroborated by the independent negotiations between
plaintiff and [a third party] regarding the charter of the barge
when the parties stipulated an agreed value . . . for insurance
purposes")).

In reliance thereon, the Museum arranged for Ridgeway USA
to obtain a $5 million insurance policy.  When Ridgeway USA
secured a $6.5 million insurance policy, the Museum paid the
premium and WHOI accepted the Policy without complaint.
Finally, when the DSC caught fire, WHOI negotiated a settlement
with Eagle and its underwriters, to the exclusion of the Museum,
awarding WHOI $3.9 million under the Policy.  In light of the
foregoing, it would be unjust to hold the Museum liable for up
to $60 million, the amount WHOI only now claims, after filing
this lawsuit, the DSC is worth.  That is because it would put
the defendant in a worse position by having negotiated and paid
for the Policy than had it not done so now that WHOI has sued
the Museum seeking a recovery well-above the Policy limit.
Furthermore, because WHOI has already received $3.9 million
under the Policy and apparently expended only $1.25 million to
restore the DSC, awarding plaintiff a dramatically higher amount

would constitute a windfall at the defendants' considerable expense.

### ii.  Ridgeway USA

Because Ridgeway USA acted as the Museum's agent pursuant to a written power of attorney in arranging for the shipment and insurance coverage of the DSC and it joins the Museum's motion for summary judgment to the extent it seeks an order that, inter alia, the value of the DSC is no more than $5 million, this Court concludes that, for the same reasons, WHOI is estopped from claiming against Ridgeway USA that the DSC is worth more than $5 million.  Indeed, the only information about the DSC's value that Ridgeway USA had came from the representations made by WHOI. See Chambers & Assoc. v. Trans World Airlines, 533 F. Supp. 426, 429 (S.D.N.Y. 1982) ("It is only just that the loss should fall on the one who with knowledge of the value involved, chose to take the chance.").  Ridgeway relied on those representations when it directed GTL to obtain a $5 million insurance policy to cover the value of the submarine which has already inured to WHOI's benefit.

To the extent plaintiffs argue that Ridgeway USA has waived any estoppel-based affirmative defense because it failed to raise such a defense in its initial pleadings, the Court is underwhelmed.  Notwithstanding Ridgeway USA's failure to plead

the defense in its answer, plaintiffs in this case have not been prejudiced by the omission. Agri-Mark, Inc. v. Niro, Inc., 214 F. Supp. 2d 33, 43 (D. Mass. 2002) (relaxing the strictures of Rule 8(c) because "no prejudice has resulted from its absence in the pleadings and fairness dictates that waiver ought not be imposed").  Other defendants pled the defense in their answers and the argument was raised before this Court and all the parties at a scheduling conference more than two years ago, in June, 2019.  Thus, plaintiffs certainly had "notice of the defense" and, therefore had "a chance to develop evidence and offer arguments to controvert [it]". Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp., 15 F.3d 1222, 1226 (1st Cir. 1994).

### iii.   ATS Specialized

Finally, as to ATS, the trucking company explains that it contracted with Ridgeway USA to transport the DSC from Woods Hole, Massachusetts to Baltimore, Maryland for the sum of $1,600.  In discussing the contract, Hodge, a representative of Ridgeway USA, informed ATS that the shipment would need to be insured for $5 million, to which ATS responded that it could not insure the submarine for that amount.  Thereafter, Hodge notified ATS that Ridgeway USA would obtain the cargo insurance for the value of the DSC, i.e. $5 million.

ATS contends that its decision to transport the DSC was dependent on its understanding that the vessel was worth no more than $5 million.  First, ATS asserts, and WHOI does not dispute, that it would not have undertaken the shipment had Ridgeway USA not obtained the $5 million cargo insurance policy and/or if the vessel was worth more than that.  Indeed, ATS claims that, based on the purported value of the DSC, it reasonably understood that even if its standard limitation of liability did not apply, its liability would not exceed that amount. Cf. 49 U.S.C. § 14706(c)(1)(A) ("[L]iability of the carrier for such property [may be] limited to a value established by written or electronic declaration of the shipper").  Finally, ATS proclaims that it would have charged more than a mere $1,600 in freight charges had the company known that it could face liability exceeding $45 million as WHOI now claims. See Schweitzer Aircraft Corp. v. Landstar Ranger, Inc., 114 F. Supp. 2d 199, 203 (W.D.N.Y. 2000) (noting that it was unreasonable for a shipper to assume that a motor carrier would take on unlimited liability in exchange for a few thousand dollars in shipping charges).

### iv.   Conclusion

Accordingly, unless superseding cause is later shown, plaintiffs are estopped from arguing hereafter that the DSC is worth more than $5 million.  In any event, it would amount to pure speculation on the part of a jury to determine that the

value of the equipment in question was anything other than $5 million.  See Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264 (1946) ("[E]ven where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork.").  First, there is no recorded fair market value for the vessel because it is an experimental submarine that was gifted to WHOI in 2013.  Rev-Lyn Contracting Co. v. Patriot Marine, LLC, 760 F. Supp. 2d 162, 168 (D. Mass. 2010) ("Evidence of value other than contemporary sales can be used only when it is shown that a vessel's market value cannot be reasonably established.").  Second, although WHOI submits expert reports opining that the value of the vessel was upwards of $60 million pre-fire, in rendering that opinion, the experts admit that "little precedence can be cited which would indicate [an] appropriate value" for the vessel.  Finally, in contrast with those reports, the record shows that WHOI ultimately spent only $1.25 million to repair the DSC and its General Counsel believed that, prior to the fire, the vessel was losing value daily, was "over-insured" at $6.5 million and was worth no more than $5 million.

    To the extent the Museum, Ridgeway USA and ATS also seek to limit the entirety of their potential liability to $1.1 million, i.e. $5 million minus the $3.9 million already paid by the insurance companies, however, their motion will be denied

because there remains genuine issues of material fact as to the total damages suffered by WHOI and to the insurer plaintiffs' right to subrogation.

### 2. ATS Specialized, Inc.

ATS has also moved for summary judgment against WHOI, the Museum and Ridgeway USA, requesting that judgment be entered in its favor as to all claims and cross-claims asserted against it.

#### i.   Preemption

##### a. The Carriage of Goods Over Sea Act

The first argument of ATS is that the claims against it must be dismissed because its liability is governed by the Carriage of Goods Over Sea Act ("COGSA"), 46 U.S.C. § 30701, et seq., which applies a one-year statute of limitations.  Because WHOI filed this lawsuit more than two years after the fire, ATS maintains that WHOI's claims against it are time-barred.

COGSA governs "contract[s] for carriage of goods between a foreign port and a port of the United States".  Greenpack of Puerto Rico, Inc. v. Am. President Lines, 684 F.3d 20, 23 (1st Cir. 2012).  On its terms, the statute covers only "the interval when the cargo is at sea" and thus,

> [w]ithout more, damage that occur[s] on the dock during the land portion of [a] shipment's journey . . . would escape COGSA's statute of limitations.

Id.

By clear and express stipulation in a through bill of lading or waybill, however, parties to a shipping contract may agree to extend COGSA's terms, defenses and limitations to an entire, multimodal shipment. Norfolk Southern R.R. Co. v. Kirby, 543 U.S. 14, 29 (2004) ("COGSA permits [the parties] to extend the default rule to the entire period in which [the goods] would be under [the carrier's] responsibility, including the period of the inland transport."). Only upon such an agreement will COGSA cover "both the ocean and inland portions of the transport". See Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp., 561 U.S. 89, 94 (2010).

In this case, ATS contends that COGSA governs its inland transport of the DSC because it was hired to deliver the DSC to Wallenius as part of a single, through shipment and Wallenius' standard waybill (which never issued) includes a provision expressly extending COGSA to all modes of transportation utilized during the through shipment. This Court finds that argument unavailing. Essentially, Wallenius never issued any waybill because the submarine caught fire before it arrived at the Port of Baltimore. Nor did it or Ridgeway USA issue any other document containing contractual language expressly extending the application of COGSA to ATS. Absent such a contract, COGSA is inapplicable to the inland transport of the DSC by ATS.

The Court is also unpersuaded by the argument of ATS that Wallenius' unissued, standard ocean waybill governs this dispute.  Although courts have concluded that unissued bills of lading may be enforceable in certain circumstances, those circumstances are absent here.  Specifically, other courts have held that parties may be bound by the terms of an unissued standard bill of lading or waybill

> where a shipper has common business experience with carriers such that it should know a carrier will issue a custom bill of lading . . . [and the] shipper has knowledge as to the contents of a carrier's standard bill of lading.

OOO Garant-S v. Empire United Lines Co., No. 11-cv-1324, 2013 WL 1338822, at *3 (E.D.N.Y. Mar. 29, 2013).  Here, however, ATS has proffered no evidence showing that the parties had any prior dealings with Wallenius and/or any other reason to know the contents of its standard waybill.  For that reason, the parties are not bound by the unissued bill's terms.

In any event, the record demonstrates that the carriage of the DSC was not intended to be a single, through shipment. See Reider v. Thompson, 339 U.S. 113, 117 (1950) ("If the various parties dealing with this shipment separated the carriage into distinct portions by their contracts, it is not for courts judicially to meld the portions into something they are not.").  In fact, ATS issued its own domestic bill of lading which made no mention of COGSA and covered only the land portion of the

- 25 -

shipment.  Furthermore, that portion of the transport was arranged and paid for by Ridgeway USA while the ocean transport was donated by Wallenius to the Museum.  See Custom Rubber Corp v. ATS Specialized, Inc., 633 F. Supp. 2d 495, 504-05 (N.D. Ohio 2009) (noting that separate bills of lading, invoices and arrangements suggest that a certain transport of goods is not a through shipment).  Given those facts, no reasonable jury could find that the land leg of the shipment was anything other than a separate and distinct transport falling outside of COGSA's scope.

### b. The Carmack Amendment

ATS contends, in the alternative, that its liability falls within the scope of the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706 ("the Carmack Amendment" or "the Amendment"), which governs the liability of carriers for lost or damaged goods and preempts state law claims relating to the same.  See Rini v. United Van Lines, Inc., 104 F.3d 502, 503 (1st Cir. 1997).  A carrier can be "a motor carrier, a water carrier, and a freight forwarder".  § 13102.  Because it is undisputed that ATS was operating as a "motor carrier" pursuant to an interstate shipment at the time of the fire, the Court agrees that its liability, if any, will be determined by traditional Carmack Amendment principles.  See § 13501; see also § 13102

(defining motor carrier as the "person providing motor vehicle
transportation for compensation").

The purpose of the Carmack Amendment is

to establish uniform federal guidelines designed in part to
remove the uncertainty surrounding a carrier's liability
when damage occurs to a shipper's interstate shipment.

Rini, 104 F.3d at 507 (citations omitted).  It generally
preempts state common law or statutory causes of action premised
upon the liability of an interstate motor carrier for damages or
loss to goods being transported via interstate commerce. Sokhos
v. Mayflower Transit, Inc., 691 F. Supp. 1578, 1581 (D. Mass.
1988).  In other words, the Carmack Amendment preempts all state
laws that "in any way enlarge the responsibility of the carrier
for loss or at all affect the ground [or measure] of recovery".
Rini, 104 F.3d at 506; see also Noble v. Wheaton Van Lines, No.
09-cv-10564, 2010 WL 3245421, at *6 (D. Mass. Aug. 17, 2010)
("With limited exceptions, the Carmack Amendment provides the
exclusive cause of action against a carrier for loss or damage
to goods that occurred as a result of interstate transport."
(citation omitted)).

Thus, any state law claim that imposes liability on a
carrier based on 1) the damage or loss of goods, 2) the claims
process or 3) the payment of claims will be preempted by the
Amendment.  It does not, however, preempt state law claims based
on "activities [by a carrier] . . . not undertaken in the course

of transporting goods". <u>Mesta</u> v. <u>Allied Van Lines Inter., Inc.</u>, 695 F. Supp. 63, 65 (D. Mass. 1988).

Because the Carmack Amendment preempts all state law claims that enlarge the responsibility or liability of a carrier with respect to a damaged shipment, the claims of WHOI for negligence and breach of bailment and the cross-claims of the Museum for indemnification and contribution are preempted. <u>See</u> <u>Rini</u>, 104 F.3d at 506; <u>see also</u> <u>5K Logistics, Inc.</u> v. <u>Daily Exp., Inc.</u>, 659 F.3d 331, 337 (4th Cir. 2011) ("The Carmack Amendment clearly preempts any state statutory or common law claim for indemnification").  So too are the Chapter 93A claim and cross-claim in this case because the ATS conduct complained of consists solely of its actions taken during the claims process as they relate to the loss to the DSC. <u>See</u> <u>Rini</u>, 104 F.3d at 506 ("Preempted state law claims, therefore, include all liability stemming from . . . the claims process.").  In particular, the underlying alleged unfair conduct of which the Museum and WHOI complain is ATS's effort to limit its liability by relying on the terms and conditions of bills of lading that were apparently non-existent at the time of the fire and/or issued only after the fire.

With respect to Ridgeway USA, however, its ability to bring cross-claims against ATS for indemnification and contribution pursuant to the Carmack Amendment depends on its classification

as either a "freight forwarder" or a "broker" under the statute which remains subject to dispute.[1]  See 49 U.S.C. § 14706(b) (entitling the carrier (e.g. freight forwarder) issuing the bill of lading "to recover from the carrier over whose line or route the loss or injury occurred"); 5K Logistics, 659 F.3d at 337 (holding that only carriers, but not brokers, can seek indemnification under the Amendment); see also JAS Forwarding (USA), Inc. v. Owens Truckmen, Inc., No. 17-cv-03589, 2017 WL 5054715, at *6 (E.D.N.Y. Nov. 1, 2017) ("[T]he difference between a carrier and a broker is often blurry, and it is apparent from the case law that the carrier/broker inquiry is inherently fact-intensive and not well suited to summary judgment." (internal marks and citation omitted)).  Indeed, the issue is the subject of Ridgeway USA's motion for summary judgment against WHOI which remains pending. See Docket No. 486. Accordingly, at this juncture, ATS is not entitled to summary judgment as to Ridgeway USA's cross-claims for indemnification and contribution.[2]

---

[1] Because Ridgeway USA concedes that it cannot support its cross-claim against ATS for spoliation of evidence under Massachusetts law, that cross-claim will be dismissed from this action.

[2] If Ridgeway USA is deemed a freight forwarder under the Carmack Amendment, it would not be precluded from pursuing that claim under the Massachusetts' door-closing statute because it has raised the indemnification claim to defend itself in these proceedings, as permitted by M.G.L. c. 156D, § 15.02(e).

ii.   **Filing Requirements**

ATS further asserts that it is entitled to judgment as to WHOI's claim under the Carmack Amendment on the ground that WHOI failed to satisfy the filing requirements set forth in 49 C.F.R. § 370.3.  Under the Carmack Amendment, a carrier can limit the period within which a shipper must properly file a claim against the carrier for cargo damage. See 49 U.S.C. § 14706(e)(1).  To properly file a claim, a shipper must comply with the minimum filing requirements set forth in Interstate Commerce Commission regulation 49 C.F.R. § 370.3(b) which requires a shipper to provide the carrier with a written or electronic communication that, inter alia, makes a "claim for the payment of a specified or determinable amount of money".  A claim for a specified amount must demand an exact dollar value and be related to the shipper's actual damage. See Bowman v. Mayflower Transit, LLC, 914 F. Supp. 2d 47, 50 (D. Mass. 2012).

ATS contends that WHOI failed to file a timely claim under the Carmack Amendment because, although plaintiff provided it with a written claim within the time specified in ATS' bill of lading, that claim failed to disclose a "specified or determinable amount of money".  Specifically, in WHOI's claim, it sought from ATS approximately $8 million.  Because WHOI now claims damages "vastly exceeding that figure", ATS asserts that WHOI's initial claim has fallen out of compliance with the

requirements set forth in § 370.3.  WHOI disagrees and urges this Court to deny ATS' motion.

This Court concludes that WHOI's initial demand of approximately $8 million satisfies the filing requirements set forth in 49 C.F.R. § 370.3(b) because it was based upon the estimated cost to repair the damage to the DSC that WHOI had in its possession at the time it filed its claim.  In fact, WHOI attached to its claim a document showing a post-fire repair estimate prepared by Edge Innovations that disclosed predicted repair costs of approximately $8 million.  That WHOI has since made claims for damages well-above that amount is irrelevant. See Delphas Sys., Inc. v. Mayflower Transit, Inc., 54 F. Supp. 2d 60, 65 (D. Mass. 1999) ("The right to amend a complaint to reflect a different claim for damages is wholly separate from the right to bring a suit when a claim sufficient to allow settlement [under § 370.3] was not made in a timely fashion.").

### iii.  Liability

With respect to its liability under the Carmack Amendment, ATS contends that it either has none because WHOI has failed to establish a claim thereunder or that it has successfully limited its liability in its bill of lading.

In order to establish a prima facie case under the Carmack Amendment, a plaintiff must prove 1) delivery to the carrier in good condition, 2) arrival in damaged condition and 3) the

amount of damages caused by the loss. <u>Missouri Pacific R.R. Co.</u> v. <u>Elmore & Stahl</u>, 377 U.S. 134, 137-38 (1964).  Thereupon, the burden of proof shifts to the carrier to show

> both that it was free from negligence and that the damage to the cargo was due to one of the excepted causes relieving the carrier of liability.

<u>Id.</u> at 138.

The Carmack Amendment imposes liability on the carrier for "actual loss or injury to the property" unless the carrier limited its liability pursuant to 49 U.S.C. § 14706(c)(1)(A). <u>See id.</u> ("[L]iability of the carrier for such property [may be] limited to a value established by written or electronic declaration of the shipper").  To limit liability, a carrier must 1) maintain an approved tariff, 2) issue a bill of lading prior to shipment and 3) give the shipper a reasonable opportunity to choose between levels of liability, provided that 4) "the shipper is a substantial commercial enterprise capable of understanding the agreements it signed". <u>Hollingsworth & Vose Co.</u> v. <u>A-P-A Transp. Corp.</u>, 158 F.3d 617, 621 (1st Cir. 1998).

Here, with respect to WHOI's prima facie case, ATS challenges only the third factor, namely, that WHOI failed to meet its burden to establish the amount of damages.  ATS contends, specifically, that WHOI has submitted no proof of the value of the DSC in its post-fire and post-repair condition and, therefore, cannot prove the amount of its damages.  Because this

Court, just now, has estopped WHOI from arguing that the DSC is worth more than $5 million, however, it will afford WHOI an opportunity to respond to that ruling with a new assessment of its total damages.

Turning to whether ATS properly limited its damages by virtue of its bill of lading, it is undisputed that ATS maintained an approved tariff.  The parties disagree, however, whether ATS issued its bill of lading before or after the fire and, therefore, whether it afforded WHOI, the Museum and/or Ridgeway USA a "fair opportunity" to "opt for more coverage in exchange for a higher rate".  Hollingsworth & Vose Co., 158 F.3d at 621 (internal quotations omitted).  Because that is a fact-intensive inquiry that remains heavily contested, summary judgment will not enter on this matter.

### 3. TravelCenters of America

#### i.  Against WHOI

TCA moves for summary judgment against WHOI on its negligence claim, contending that the plaintiff has failed to proffer evidence showing that TCA breached its duty of care and/or caused the fire.  As reason therefor, TCA asserts that none of the experts can determine conclusively whether the condition causing the fire existed in the subject Trailer at the time TCA serviced and inspected the vehicle.  In support, TCA cites to the prior Memorandum and Order entered by this Court

dismissing STTC as a party from this lawsuit. See Docket No. 444.  In dismissing STTC, this Court explained that WHOI was unable to raise the causal connection between the STTC tire change and the fire beyond mere speculation because the record showed that WHOI's experts 1) are unsure when the condition causing the fire arose and whether it was present at the time of the tire change (which took place two weeks after the TCA service) and 2) attribute the fire to an air leak in the rear-axle brake chamber, an area completely separate and distinct from where STTC's tire technician replaced the flat tire.

WHOI responds that, inter alia, the actions and testimony of the TCA service technician demonstrate (at the very least) a genuine issue of material fact that TCA caused the fire because, 1) less than three weeks before the fire, the Trailer was sent for TCA service with a complaint of an air leak, 2) the TCA service technician was unable to identify any such air leak and 3) WHOI's experts opine that the cause of the fire was an air leak at or near the rear axle which is the exact location the TCA service technician inspected and serviced.  Furthermore, WHOI contends that a reasonable jury could find that TCA's service technician breached the applicable standard of care because he admitted in his deposition testimony that he failed to follow proper procedure to identify the complained of-air leak.

Liability for negligence requires proof that the defendant 1) owed a legal duty to the plaintiff, 2) which the defendant breached, thereby 3) causing 4) injury to the plaintiff. Davis v. Westwood Group, 652 N.E. 2d 567, 569 (Mass. 1995).  Proof of causation requires a demonstration not merely of cause in fact but also of proximate or legal cause, i.e. that the plaintiff's injury was "within the reasonably foreseeable risk of harm created by defendant's negligent conduct". Staelens v. Dobert, 318 F.3d 77, 79 (1st Cir. 2003) (citations omitted).

Here, the Court agrees with WHOI that, viewing the record in its favor, a reasonable jury could find that the TCA service technician breached his standard of care and, as a result, caused the fire.  Indeed, it is apparently undisputed that 1) an air leak was reported in the Trailer when it arrived at TCA on July 7, 2015, 2) the TCA technician failed to identify the air leak or use standard procedures in attempting to do so and 3) an air leak contributed to the fire that arose less than three weeks later.  Thus, the Court will not enter summary judgment in favor of TCA with respect to WHOI's negligence claim. See Jupin v. Kask, 849 N.E.2d 829, 835 (Mass. 2006) ("We generally consider . . . whether a defendant exercised reasonable care, the extent of the damage caused, and whether the defendant's breach and the damage were causally related [] to be the special province of the jury.").

### ii.   Against the Museum

TCA also moves for summary judgment against the Museum with respect to the latter's cross-claim for indemnification.  WHOI asserts two claims against the Museum: breach of contract (Count XII) and breach of bailment obligations (Count XIII).  The Museum, in-turn, has filed a cross-claim against all co-defendants for "indemnity and indemnification" in the event any liability is imposed on the Museum for any loss or damage to the DSC.  TCA contends that summary judgment must enter in its favor with respect to that cross-claim because there is no contractual, agency or other particularized relationship between the two parties as required for indemnification under Massachusetts law.  As such, TCA argues that the Museum has no cognizable basis for its indemnity claim against the cross-defendant.

The Museum responds that no special relationship is necessary for its cross-claim to succeed.  It concedes that it is not seeking from TCA contractual indemnification but contends that it can establish a right to tort-based indemnification in connection with WHOI's breach of bailment claim.  First, the Museum asserts that, in a Report and Recommendation which this Court adopted, Magistrate Judge Boal acknowledged that breach of bailment claims may be brought in contract and/or tort, thereby permitting contract- and tort-based indemnification.  Second,

the Museum maintains that its tortious indemnification cross-claim does not require proof of a pre-existing relationship between the parties because the claim arises under Connecticut (rather than Massachusetts) law which does not require proof of a pre-existing relationship between an indemnitee and an indemnitor.

TCA rejoins that 1) since the Report and Recommendation entered, WHOI has clarified that its claims against the Museum are contract based, 2) the Museum thus brings against TCA only a claim for contractual indemnity which fails due to a lack of contractual relationship between the parties and, in any event, 3) the Museum has waived any choice-of-law argument because, prior to the instant opposition, the parties and the Court have applied Massachusetts law.  Indeed, this is the first pleading in which the Museum has argued that Connecticut law should apply to any of its cross-claims.

A right to indemnification may arise under three theories, namely, 1) an express agreement, 2) a contractual right implied from the nature of the relationship between the parties and 3) a common law tort-based right. See Araujo v. Woods Hole, Martha's Vineyard, Nantucket Steamship Auth., 693 F.2d 1, 2 (1st Cir. 1982); see also Clark v. Castaldi, No. cv0750079215, 2008 WL 803637, at *2 (Super. Ct. Conn. Mar. 4, 2008) (recognizing two

kinds of indemnification under Connecticut law: contractual and tortious).

As against TCA, this Court concludes that the Museum's cross-claim for indemnification must be supported by the second theory, a contractual right, because all of WHOI's claims against the Museum are contract-based. See Warsahw v. QBE Ins. Corp., 2012 U.S. Dist. LEXIS 118507, at *19 (D. Mass. Aug. 22, 2012) ("[T]he Court is aware of [no case] in which a common law right to indemnity has been recognized in a breach of contract case."); Clark, 2008 WL 803637, at *2 ("Tortious indemnification is an action that arises [only] between two tortfeasors."). Indeed, in January, 2021, WHOI filed a pleading expressly stating that

> all of the Plaintiff's claims against the [Museum] are
> contract based – breach of contract and breach of bailment.

The Museum recognizes that fact in its motion for summary judgment against WHOI. See Docket No. 476-1 ("WHOI has expressly stated that this cause of action[, i.e. breach of bailment,] is a contract-based cause of action").  Although a breach of bailment claim may, generally, sound in both contract and tort, WHOI's breach of bailment claim against the Museum in this case is clearly contract-based.

Accordingly, because no contractual relationship exists between the two parties, and the Museum concededly is not

pursuing a contract-based indemnification cross-claim against
TCA, summary judgment will enter in favor of TCA. See Kelly v.
Dimeo, Inc., 581 N.E.2d 1316, 1317 (Mass. Appt. Ct. 1991)
("Under Massachusetts law, a contract-based right to
indemnification exists only if there is a binding contract
between indemnitor and indemnitee."); see also Danbury Bldgs.,
Inc. v. Union Carbide Corp., 963 F. Supp. 2d 96 (D. Conn. 2013)
("Under Connecticut law, to state a contract-based
indemnification claim, the claimant must allege either an
express or implied contractual right to indemnification."
(internal marks omitted)).  The Museum's indemnification cross-
claim against TCA will, therefore, be dismissed.

### 4. Insurance Coverage

Both Ridgeway USA and the Museum contend that they qualify
as "insureds" under the Policy and are entitled to its benefits
and protection from claims in subrogation.  Plaintiffs disagree
and urge this Court to deny the defendants' request to declare
them so because, inter alia, reasonable jurors could disagree as
to whether GTL intended for Ridgeway USA and/or the Museum to be
covered by the Policy and whether either defendant has a
cognizable insurable interest under it.

As a threshold matter, this Court concludes that English
law properly governs the Policy because the Policy expressly
provides that "[t]his insurance is subject to English law and

practice" and no party has presented any other law which should govern.  When determining the contours of foreign law, federal courts have wide discretion pursuant to Fed. R. Civ. P. 44.1.  A court "may consider any relevant material or source" and is permitted, but not required, to conduct its own research. Fed. R. Civ. P. 44.1; Mackley v. Sullivan & Liapakis, P.C., No. 98-cv-8460, 2001 U.S. Dist. LEXIS 21723, at *10-11 (S.D.N.Y. Dec. 27, 2001).  It can also direct the parties to brief a particular question with respect to the relevant foreign law and/or demand a more "complete presentation [of that law] by counsel". See Mackley, 2001 U.S. Dist. LEXIS 21723, at *11.

To help this Court discern the contours of English insurance law, the Museum and Ridgeway USA have proffered the opinion of expert Peter MacDonald Eggers ("Mr. Eggers"), a barrister and Queen's Counsel in England.  Plaintiffs have proffered no expert in rebuttal.  According to Mr. Eggers, English law dictates that a party may become an insured under an insurance policy in one of three ways, namely,

1) where the party is named as an insured in the policy;

2) where the party comes within a descriptive class of insureds; or

3) where the named insured enters into the insurance contract on behalf of the party (whether as a disclosed or undisclosed principal), even if the named insured also enters into the contract on its own behalf.

A party can fall within the second or third categories if, at the conclusion of the insurance contract, it is determined that the named insured 1) was authorized to enter into the insurance contract on behalf of and 2) intended to place the insurance for the benefit of that party. See National Oilwell (UK) Ltd. v. Davy Offshore Ltd. [1993] 2 Lloyd's Rep. 582, 596–97.

Moreover, pursuant to section 6(1) of the Marine Insurance Act 1906 ("the Act"), an insured party is entitled to the benefits of an insurance policy only if it has an insurable interest at the time of the loss.  Section 5 of that Act defines an insurable interest as an interest in a marine adventure which includes:

> any legal or equitable relation to the adventure or to any
> insurable property at risk therein, in consequence of which
> he may benefit by the safety or due arrival of insurable
> property, or may be prejudiced by its loss, or by damage
> thereto, or by the detention thereof, or may incur
> liability in respect thereof.

Even if this Court were to rely on the legal principles outlined by the English law expert proffered by the Museum and Ridgeway USA, this Court finds that there remains genuine issues of material fact as to whether either party is an insured under the Policy.  Specifically, the parties dispute whether GTL intended for the Museum and Ridgeway USA to be deemed insureds under the Policy. Cf. Sawyer v. United States, 76 F. Supp. 3d 353, 359 (1st Cir. 2015) (explaining that the resolution of

ambiguity in a contract turns on the parties' intent which "is a question of fact for a jury").

Ridgeway USA and the Museum have proffered affidavits of the individuals involved in purchasing the Policy stating that they "expected" both to be covered thereunder.  Curiously, although Margo Blanco, the General Manager of GTL, now states that expectation, when negotiating for the Policy, she never asked that either Ridgeway USA or the Museum be named as insureds.  Rather, she instructed only that GTL be named as the insured, WHOI as the shipper and the Museum as consignee. Furthermore, contrary to Becky Hodge's statement in her affidavit that she, too, expected both parties to be covered by the Policy, she testified in her deposition that she did not expect that the Policy would name the Museum as an insured and believed, instead, that WHOI was the named insured.  Finally, in yet another deposition, a representative of Eagle testified that, at the time its underwriters issued the Policy, he "didn't know Ridgeway existed".

Evidently, the determination of whether Ridgeway USA and the Museum are covered by the policy turns on intent which requires an evaluation of the weight and credibility of the testimony and evidence in connection with the intent of the named insured, i.e. GTL.  Because that evaluation is uniquely within the province of the trier of fact, summary judgment as to

whether the Museum and Ridgeway USA are insureds under the subject Policy is unwarranted at this juncture. See McConaghy v. Sequa Corp., 294 F. Supp. 2d 151, 161 (D.R.I. 2003) ("A judge deciding [a summary judgment] motion should not invade the province of the trier of fact by weighing the evidence or making credibility determinations.").

                              **ORDER**

For the foregoing reasons,

- The motion of Ridgeway International USA, Inc. ("Ridgeway USA") for "partial" summary judgment against Eagle Underwriting Group, Inc. and its underwriters (Docket Nos. 423) is **DENIED**;

- The motion of TravelCenters of America ("TCA") for summary judgment on the indemnification cross-claim of the Australian National Maritime Museum ("the Museum") (Docket No. 445) is **ALLOWED**;

- The motion of ATS Specialized, Inc. ("ATS") for summary judgment on all causes of action of plaintiff Woods Hole Oceanographic Institution (Docket No. 450) is,

    o with respect to Counts II, III & IV, **ALLOWED**; but

    o otherwise, **DENIED**;

- The motion of ATS for "partial" summary judgment on limitation of liability (Docket No. 453) is,

    o to the extent ATS seeks to estop WHOI from claiming that the submarine is worth more than $5 million, **ALLOWED**; but

    o otherwise, **DENIED**;

- The motion of ATS for summary judgment on Ridgeway USA's cross-claims (Docket No. 455) is,

- o with respect to the third cross-claim for spoliation of evidence, **ALLOWED**; but

- o otherwise, **DENIED**;

- The motion of ATS for summary judgment on cross-claims of the Museum (Docket No. 457) is **ALLOWED**;

- The motion of the Museum for "partial" summary judgment (part, but not all, of Docket No. 476), in which Ridgeway USA joins (Docket No. 525) is,

  - o to the extent the Museum seeks an order estopping WHOI from arguing that the subject submarine is worth more than $5 million, **ALLOWED**;

  - o to the extent it seeks to limit all damages to $1.1 million, **DENIED**; but

  - o otherwise, held under advisement;

- The motion of the Museum for "partial" summary judgment that subrogated claims cannot be pursued against it (Docket No. 481), in which Ridgeway USA joins (Docket No. 522) is, **DENIED**;

- The motion of TCA for summary judgment on plaintiffs' claim against it (Docket No. 495) is **DENIED**;

- The motions of Eagle Underwriting Group, Inc., et al. to strike (Docket Nos. 556, 557, 558, 559 & 650) are **DENIED**;

- The objections of ATS (Docket No. 661) and Eagle Underwriting Group, Inc., et al. (Docket No. 662) to the ruling of Magistrate Judge Jennifer C. Boal precluding the testimony of Samuel "Duke" Drinkard (part, but not all, of Docket No. 648) are,

  - o with respect to the preclusion of the expert's testimony in its entirety, **SUSTAINED**, but

  - o otherwise, **OVERRULED**;

To the extent the parties seek attorneys' fees, this Court finds those requests premature and, at this juncture, they are

**DENIED without prejudice.** See <u>Formulatrix, Inc.</u> v. <u>Rigaku</u> <u>Automation, Inc.</u>, 344 F. Supp. 3d 410, 432 (D. Mass. 2018) ("[T]his court awaits the final adjudication on the merits before it will entertain requests for attorneys' fees." (internal citation omitted)).

All other motions are held under advisement.

**So ordered.**

<u>/s/ Nathaniel M. Gorton</u>
Nathaniel M. Gorton
United States District Judge

Dated August 20, 2021